TRENT PETRIE, a Minor, by Pattsi Petrie, his Mother and Next Friend, Plaintiff-Appellant, *v.* ILLINOIS HIGH SCHOOL ASSOCIATION *et al.*, Defendants-Appellees.

Fourth District   No. 15362

Opinion filed September 6, 1979.

CRAVEN J., dissenting.

Marc J. Ansel, of Ansel, Eisenberg & Marsh, of Champaign, for appellant.

Rooks, Pitts, Fullager & Poust, of Chicago, and Franklin, Flynn & Palmer, of Champaign (John G. Poust, Wayne F. Plaza, Margaret S. Garvey, John L. Franklin, and Daniel A. Baechle, of counsel), for appellees.

Mr. JUSTICE GREEN delivered the opinion of the court:

Plaintiff Trent Petrie by his mother and next friend, Pattsi Petrie, challenges (1) a rule of Champaign Central High School (Central) operated by defendant Champaign Community Unit School District No. 4 (Unit 4) which restricts membership on the sole volleyball team sponsored by the school to girls, and (2) rules of defendant Illinois High School Association (IHSA), a voluntary association of public and private high schools of the state, which restrict membership on the teams participating in the only volleyball tournament sponsored by it to girls.

On September 14, 1978, plaintiff brought suit in the circuit court of Champaign County seeking an injunction against Unit 4's enforcement of its rule which prohibited him from playing on the volleyball team and against IHSA rules which prevented him from competing in the only IHSA sponsored State volleyball tournament. During subsequent proceedings, a temporary restraining order and a preliminary injunction were denied. Later, after a hearing on the merits, plaintiff's suit was dismissed for want of equity. Plaintiff appeals from that order.

At the hearing on the merits, some of the evidence was received by stipulation, and the parties agreed that evidence received at the hearing on the request for preliminary injunction might be considered. Plaintiff was shown to then be a 16-year-old junior, 5'11" in height and 170 lbs. in weight, who had reported for the team and had been practicing with it when informed by school officials that he could not play in games with other schools because of defendants' rules. Much of the evidence including the matters set forth in the opening paragraph was not disputed. The other details of the evidence can best be discussed with the points of law to which they relate.

The trial court reasoned that the prohibitions against boys were classifications based on sex but were justified because they preserved, fostered and increased athletic competition for girls and prevented unfair competition that would arise from male dominance of the game. Defendants seek to support the decision on the same basis. Plaintiff agrees that there is a valid State interest in preserving, fostering and increasing athletic opportunities for girls but strongly disagrees that there is any important State interest in avoiding an imbalance in competition or preventing a male dominance. He also asserts that the classification is both overbroad and underbroad and uses sex as a proxy for the actual target as a mere matter of convenience. Although plaintiff does not concede that Central and IHSA may have separate volleyball teams and tournaments for boys and girls, the major thrust of his argument is that it is constitutionally impermissible to have volleyball teams and tournaments only for girls without opportunity for participation by boys.

There is no dispute that to be valid the regulations attacked must meet the requirements of the due process clause of the fourteenth amendment as well as article I, section 18, of the Illinois Constitution of 1970, which prohibits "the State or its units of local government and school districts" from denying or abridging equal protection of the laws on account of sex. Unit 4 is a school district and its action is State action regulated by the fourteenth amendment. IHSA's status is not as clear, but it concedes that because of its formation as an organization of schools, mostly public, its actions are also that of the State. Defendants also

concede the applicability of section 27—1 of the School Code which states in part:

"No student shall, solely by reason of that person's sex, be denied equal access to physical education and interscholastic athletic programs or comparable programs supported from school district funds. Equal access to programs supported from school district funds and comparable programs will be defined in guidelines promulgated by the State Board of Education in consultation with the Illinois High School Association." Ill. Rev. Stat. 1977, ch. 122, par. 27—1.

The United States Supreme Court has never treated classifications based on gender as suspect and subject to strict scrutiny as it has done with those based on such factors as race, alienage and nationality. (*In re Griffiths* (1973), 413 U.S. 717, 37 L. Ed. 2d 910, 93 S. Ct. 2851.) Rather, it has held in *Craig v. Boren* (1976), 429 U.S. 190, 197, 50 L. Ed. 2d 397, 407, 97 S. Ct. 451, 457, that gender based classifications "must serve important governmental objectives and must be substantially related to achievement of those objectives." A similar statement has also been applied in *Orr v. Orr* (1979), 440 U.S. 268, 59 L. Ed. 2d 306, 99 S. Ct. 1102; *Califano v. Webster* (1977), 430 U. S. 313, 51 L. Ed. 2d 360, 97 S. Ct. 1192; and *Califano v. Goldfarb* (1977), 430 U. S. 199, 51 L. Ed. 2d 270, 97 S. Ct. 1021.

The provision of article I, section 18, of the Illinois Constitution of 1970, prohibiting a denial of equal protection because of sex, was first interpreted and applied by the Illinois Supreme Court in *People v. Ellis* (1974), 57 Ill. 2d 127, 311 N.E.2d 98. The court found to be invalid section 2—7(1) of the Juvenile Court Act (Ill. Rev. Stat. 1971, ch. 37, par. 702—7(1)) which at the time the offenses charged were committed provided that no boy under 17 and no girl under 18 at the time of the alleged offense could be prosecuted under the criminal laws of the State.

The court referred to the debate which occurred when section 18 was proposed on the floor of the convention as an amendment to the report of the Bill of Rights Committee. Proponents of the amendment had argued that courts had interpreted the general equal protection clause in such a manner that classifications based on sex were common and proper so that the proponents felt that such an amendment was necessary in order to guarantee women the same type of equality granted, for example, to blacks. (5 Record of Proceedings, Sixth Illinois Constitutional Convention 3669, 3675-76.) In view of the debates and the specific language of the provision, the court found "inescapable" the conclusion that section 18 was intended to supplement and expand the guarantees of the general equal protection clause and, therefore, ruled that "a classification based

on sex is a 'suspect classification' which, to be held valid, must withstand 'strict judicial scrutiny.' " 57 Ill. 2d 127, 132-33, 311 N.E.2d 98, 101.

The State interest required to meet the Federal "strict scrutiny" standard has been described by the United States Supreme Court as "overriding" (*Loving v. Virginia* (1967), 388 U. S. 1, 11, 18 L. Ed. 2d 1010, 1017, 87 S. Ct. 1817, 1823); "compelling" (*Graham v. Richardson* (1971), 403 U.S. 365, 375, 29 L. Ed. 2d 534, 544, 91 S. Ct. 1848, 1854); or "substantial" (*In re Griffiths* (1973), 413 U.S. 717, 722, 37 L. Ed. 2d 910, 915, 93 S. Ct. 2851, 2855). The *Ellis* court found "no compelling state interest" which justified the disparate treatment. Necessity to accomplish the government interest has also been stated to be a required element in meeting the Federal "strict scrutiny" standard (*e.g., In re Griffiths; Loving*). *Ellis* did not discuss this factor.

Illinois Supreme Court cases subsequent to *Ellis* have not further explained the "strict scrutiny" standard as it is to be applied in Illinois. In *People v. Boyer* (1976), 63 Ill. 2d 433, 349 N.E.2d 50, *cert. denied* (1977), 429 U. S. 1063, 50 L. Ed. 2d 779, 97 S. Ct. 789, sections 11—10 and 11—11 of the Criminal Code (Ill. Rev. Stat. 1973, ch. 38, pars. 11—10, 11—11), which make incest committed by a father with a daughter a more serious offense than that committed by a mother with a son, were held to be valid. The court reasoned that the child was the victim of incest, and that when the victim was a female who could become pregnant, the damage was greater than when the victim was a male. The court questioned whether the classification was one based entirely on gender but stated that if it was, the foregoing reasoning justified it under the strict scrutiny standard. Again, the element of necessity was not discussed.

Neither the United States Supreme Court nor the courts of review of this State have previously dealt with gender-based classifications as related to eligibility to participate on athletic teams or in athletic events. Cases from other jurisdictions are of recent origin. In *Brenden v. Independent School District 742* (8th Cir. 1973), 477 F. 2d 1292; *Morris v. Michigan State Board of Education* (6th Cir. 1973), 472 F. 2d 1207; *Gilpin v. Kansas State High School Activities Association, Inc.* (D. Kan. 1973), 377 F. Supp. 1233; *Reed v. Nebraska School Activities Association* (D. Neb. 1972), 341 F. Supp. 258; and *Haas v. South Bend Community School Corp.* (1972), 259 Ind. 515, 289 N.E.2d 495, rules prohibiting capable girls from playing on boys' teams were all struck down upon State or Federal equal protection grounds.

In *Leffel v. Wisconsin Interscholastic Athletic Association* (E. D. Wis. 1978), 444 F. Supp. 1117, a rule excluding girls from boys' teams in contact sports was similarly deemed invalid unless girls' teams were established. In *Darrin v. Gould* (1975), 85 Wash. 2d 859, 540 P.2d 882, and

*Commonwealth v. Pennsylvania Interscholastic Athletic Association* (1975), 18 Pa. Commw. Ct. 45, 334 A.2d 839, exclusion of capable girls from boys' teams even in contact sports was ruled to be violative of equal protection regardless of the existence of girls' teams.

The exclusion of girls from boys' teams was generally sought on grounds that girls, as a group, were less capable than boys at the sports involved and, in the contact sports, that they were more prone to injury. The courts rejected these arguments, reasoning that the blanket prohibition placed a stigma of inferiority on girls as an excluded class and that the obviously better way to determine whether they were capable of playing was to give them a try out and then let the coach make a subjective determination as to whether they were capable of playing. The argument as to the danger of injury was answered by noting that not all girls were of a physique making them excessively injury prone and that, in any event, no objective standards had been set forth to eliminate the more frail boys.

Here, boys were the excluded class and their exclusion was made not because they were not likely to be good enough but because they were likely to be too good to permit adequate opportunities for girls. As stated in *Attorney General v. Massachusetts Interscholastic Athletic Association, Inc.* (hereinafter *MIAA*) (1979), ___ Mass. ___, 393 N.E.2d 284, the exclusion here carries no stigma of unworthiness to the excluded class. *MIAA* and *Gomes v. Rhode Island Interscholastic League* (D. R.I. 1979), 469 F. Supp. 659 (subsequently declared moot by the United States Court of Appeals, First Circuit, Docket No. 79-1181, August 31, 1979), both very recently decided, are the only reported cases called to our attention ruling upon the propriety of excluding males from public athletic teams in order to enhance and protect the athletic opportunities of females.

In *Gomes*, the plaintiff sought to play on a high school volleyball team limited to girls at a school that had no other volleyball teams on which boys could play. The defendant was an organization similar to IHSA and similarly provided volleyball competition only for teams composed exclusively of girls. The school had teams open to members of both sexes in cross country, tennis, track, basketball and baseball. The opinion recited that boys constituted "the overwhelming majority on those teams * * *." (469 F. Supp. 659, 661.) Teams exclusively for girls were provided in tennis, track, basketball, gymnastics, volleyball and softball. A football team, limited to boys for safety reasons, was also provided. Upon being denied permission to play on the volleyball team after having practiced with it, plaintiff brought suit to nullify the defendants' rules against his participation. He claimed violation of the Federal due process clause and 42 U.S.C. §1983 (1976).

The team coach testified that in her opinion the playing skills of boys

and girls were equal but conceded that if the game became more popular with boys, they would begin to dominate the teams. The latter conclusion was supported by the testimony of a physician and a researcher that high school boys' greater muscle strength, height, and length of limbs placed girls at such a disadvantage that few girls would be able to play if the sport were opened to boys.

Referring to this evidence, the court stated:

"In light of the evidence, these contentions are difficult to dispute. Rogers High has made a noble and noteworthy effort to provide athletic opportunities for females. At the high school level, the average male is objectively more physically capable than the average female. Open competition would, in all probability, relegate the majority of females to second class positions as benchwarmers or spectators. As the Sixth Circuit noted in the context of basketball,

'[w]hen the classification, as here, relates to athletic activity, it must be apparent that its basis is the distinct differences in physical characteristics and capabilities between the sexes and that the differences are reflected in the sport of basketball by how the game itself is played. It takes little imagination to realize that were play and competition not separated by sex, the great bulk of the females would quickly be eliminated from participation and denied any meaningful opportunity for athletic involvement.' *Cape v. Tennessee Secondary Sch. Athl. Ass'n.*, 563 F. 2d 793, 795 (6th Cir. 1977).

Distinguishing between male and female athletics raises no constitutional problems. The school committee has acted upon a demonstrably benevolent purpose and on objective and accurate medical evidence. *See Califano v. Webster*, 430 U. S. 313, 97 S. Ct. 1192, 51 L. Ed. 2d 360 (1977). There is, however, no dispute on this aspect of Rogers High's athletic program. Plaintiff readily agrees that 'separate but equal' teams are not only athletically beneficial, but also constitutionally permissible. *See Hoover v. Meiklejohn*, [430 F. Supp. 164 (D. Colo. 1977)]; *Ritacco v. Norwin Sch. Dist.*, 361 F. Supp. 930 (W. D. Pa. 1973); *Bucha v. Illinois High Sch. Ass'n.*, 351 F. Supp. 69 (N. D. Ill. 1972)." 469 F. Supp. 659, 662-63.

The court then discussed the question of whether the separate team tournament for girls could properly be maintained when no such volleyball opportunities for boys were provided. Consideration was given to Rule 41(b) of the regulations promulgated under title IX, which provided:

"(b) *Separate Teams.* Notwithstanding the requirements of

paragraph (a) of this section, a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport. *However, where a recipient operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex, and athletic opportunities for members of that sex have previously been limited, members of the excluded sex must be allowed to try-out for the team offered unless the sport involved is a contact sport.* For the purposes of this part, contact sports include boxing, wrestling, rugby, ice hockey, football, basketball and other sports the purpose or major activity of which involves bodily contact." (Emphasis added.) 45 C.F.R. §86.41(b) (1978).

Although agreeing that the phrase "athletic opportunities" used in the rule could mean overall athletic opportunities, as the words would imply, the court stated that it was required to construe it to mean opportunities in the sport under consideration in order to give the words a constitutionally valid construction. The court reasoned that if a State governmental unit had a volleyball team limited to girls but none upon which boys might play, when boys had actually had less volleyball playing opportunities than girls, even though boys had had more general athletic opportunity, a violation of the fourteenth amendment due process clause might occur. The court then construed the rule to prohibit the exclusion of boys under the defendants' regulations unless a separate boys' team was established or some other method was used to provide boys with the opportunity to play interscholastic volleyball. The court, noting that the plaintiff was stated by his coach to be only from sixth to ninth best on the squad, concluded that no great harm could result from the participation of one mediocre player and ordered a preliminary injunction to issue.

In *MIAA,* pursuant to the request of a group interested in women's sports participation, the defendant, a Massachusetts counterpart of IHSA, enacted a rule prohibiting boys from playing on teams designated for girls. Girls' teams were recognized in basketball, cross country, field hockey, golf, gymnastics, lacrosse, soccer, softball, skiing, swimming, tennis, track and volleyball. Boys' teams were recognized in baseball, basketball, cross country, football, golf, gymnastics, hockey, lacrosse, riflery, skiing, soccer, swimming, tennis, track, volleyball and wrestling. Girls were allowed to play on a boys' team if there was not a girls' team in that sport. Ruling on a petition brought by the State's Attorney General, the Supreme Judicial Court of Massachusetts held that the defendant's total exclusion of boys' participation on teams designated for girls violated an equal protection provision of that State's constitution which,

like section 18 of article I of the Illinois Constitution, made specific reference to gender.

The opinion emphasized that no question had been raised as to the exclusion of boys when separate teams for them were offered in the same sport and apparently the court approved of the validity of such an arrangement because it said:

> "It can be expected that the present decision will make little practical difference in the traditional conduct of interscholastic athletic competition, for that will proceed in the great majority of instances on a basis of 'separate but equal' teams whose validity is assumed here."

The court stated that although high school boys had innate advantages for some sports, in those sports featuring balance, precision or strategy, girls were apparently at least equal and possibly excelled. The court pointed out that the rule would exclude boys' participation on gymnastic teams designated for girls even though the boys might be at a disadvantage. The court stated,

> "Classification on strict grounds of sex, without reference to actual skill differentials in particular sports, would merely echo 'archaic and overbroad generalizations.' *Schlesinger v. Ballard* [(1975), 419 U. S. 498, 508, 42 L. Ed. 2d 610, 618, 95 S. Ct. 572, 577]."

Plaintiff's argument does not assume, as does *Gomes* and apparently *MIAA*, that public schools are not constitutionally barred from sponsoring athletic teams for girls as long as a similar team is sponsored for boys. If the full application of the strict scrutiny test for suspect classifications applicable under the fourteenth amendment is also applicable under article I, section 18, of the Illinois Constitution, the question is a close one. Yet there is a long-standing international and national tradition of having separate teams for males and females, and no case has been called to our attention holding that under those circumstances males have a constitutional right not to be barred because of their gender from playing on teams designated exclusively for females.

The evidence in this case, much like in *Gomes*, showed that, in general, high school boys are substantially taller, heavier and stronger than their girl counterparts and have longer extremities. Although we recognize that high school girls have no general disadvantage as to balance, coordination, strategic acumen, or quickness (as distinguished from running speed), we agree that they are generally at a substantial physical disadvantage in playing volleyball. Illustrative of the consequences of such disadvantage as applied to other sports were (1) the indication in *Gomes* that at the plaintiff's high school the "overwhelming majority" of the positions on teams open to both sexes were held by boys,

and (2) testimony in the instant case that in the high school track season previous to the trial, none of the girls' State record holders in track and field "would have qualified in any event for the boys' state track and field meet." Evidence in the instant case of isolated instances of male participation upon girls' teams creating an advantage for those teams indicated the likelihood of similar results if any substantial number of males chose to participate in volleyball.

Classification of a high school volleyball team to limit its membership to girls is consistent with a long-standing tradition in sports of setting up classifications whereby persons having objectively measured characteristics likely to make them more proficient are eliminated from certain classes of competition. Heavier persons are prohibited from competing in lighter weight classes in wrestling and boxing. Persons over a certain age are often prohibited from participating in interscholastic athletics and those under a certain age from competing in events sponsored for senior citizens. Membership in certain interscholastic teams has been limited to those who have not completed their sophomore year. At one time, intercollegiate football between teams whose members weighed no more than 150 lbs. was popular and many high schools and elementary schools have had heavyweight and lightweight football teams. There is no stigma attached to a person eliminated by this system from competing in a class in which that person might have undue advantage.

Suggestion is made that rather than using sex as a classifying factor, teams should be classified on the basis of characteristics mentioned in the last paragraph and done in such a way that in sports where females had a physical disadvantage, they would compete in a class where the disadvantage would be eliminated. Of course, height might be such a measure for volleyball and a school could have a team whereby most girls would be with boys more nearly their size. However, this would not compensate for the strength differential and would cause great hardship to the taller girls, most of whom would not have the musculature to compete with taller boys. We conclude that a system of measurement to put girls into classes whereby they would be on a physical par with males who would compete in that class would be too difficult to devise. Although systems of handicapping based on measurable prior performance such as golf or bowling scores are used, in those sports and in other individual sports, ratings can be obtained on the basis of prior performance. In team sports, however, any rating of players could only be done on a very subjective basis and would not be practical. Furthermore, even in the individual sports, a system of rating and handicapping places a premium on poor prior performance and is

inconsistent with a system of full competition which boys have had for years and which girls are seeking to achieve.

The classification of public high school athletic teams upon the basis of gender in sports such as volleyball is itself based on the innate physical differences between the sexes. It is not based on generalizations that are "archaic" (*Schlesinger v. Ballard* (1975), 419 U. S. 498, 508, 42 L. Ed. 2d 610, 618, 95 S. Ct. 572, 577), nor does it represent an attitude of "'romantic paternalism' " (*Frontiero v. Richardson* (1973), 411 U. S. 677, 684, 36 L. Ed. 2d 583, 590, 93 S. Ct. 1764, 1769). Like all systems of classifications for competition, it is overbroad and underbroad in that it includes females who are athletically superior to many males and excludes males who are less well-endowed athletically than most females. However, we are convinced that it is the only feasible classification to promote the legitimate and substantial State interest of providing for interscholastic athletic opportunity for girls.

■■ Schools could have varsity, subvarsity and lesser levels of varsity squads, and no doubt eventually provide the opportunity for a very substantial number of girls to compete in each sport. We must recognize, however, that public institutions have a limited amount of funds and it is common knowledge that many school districts are extremely pressed to maintain their present programs. The extra expense of having this number of squads is obvious. Moreover, to arrange the program in such a way that many girls are denied the chance to be on a team that is described as the school team, although with a gender designation, would seem to be a very high price to pay for a complete equality of sexes.

■■ We have no trouble in concluding that having a separate volleyball team and separate tournaments in that sport for girls is substantially related to and serves the achievement of the important governmental objective of maintaining, fostering and promoting athletic opportunities for girls. It, therefore, satisfies the due process requirements of the fourteenth amendment.

Satisfying the requirements of article I, section 18, of the Illinois Constitution is more difficult. *Ellis* indicates that the "strict scrutiny" standard must be met for a classification based on gender to meet the requirements of that section. Whether the necessity of such a classification must be shown in order to meet that standard has not been answered in this State. The different punishments provided by sections 11—10 and 11—11 of the Criminal Code were approved in *Boyer* and found to meet the strict scrutiny standard, but no mention was made that the disparate sentence was the only way to prevent the offense of incest committed by a father against his daughter.

We are unaware of any indication that the sponsoring by public

schools of separate athletic teams classified by sex was ever cited as an evil to be remedied by the relatively recent adoption of section 18 or other similar constitutional provisions recently adopted in many other States. We deem the preservation, fostering and promotion of interscholastic athletic competition for both boys and girls to be a matter of compelling governmental interest. Both because of past disparity of opportunity and because of innate differences, boys and girls are not similarly situated as they enter into most athletic endeavors. Although classification of teams based on gender is not an absolute necessity in attempting to achieve those governmental interests, we are persuaded that the combination of problems which we believe to be likely to arise from attempts to do so through other classifications, creates a substantial element of necessity.

When a governmental goal is to preserve, foster and promote the opportunities of those of a gender, an element of affirmative action is necessarily involved. The recent, widely publicized decision in *Regents of the University of California v. Bakke* (1978), 438 U. S. 265, 57 L. Ed. 2d 750, 98 S. Ct. 2733, indicates that affirmative action may not, of itself, justify a classification or quota but that it may be taken into consideration in decision making. Moreover, although *Ellis* indicated that the drafters of section 18 intended to incorporate the then existing strict scrutiny standards applied by the fourteenth amendment to racial and certain other classifications, the drafters did not necessarily intend to adopt as applicable to section 18, all ramifications of strict scrutiny *subsequently* adopted by the United States Supreme Court. Much discussion concerning section 18 indicated an intention to aid females. The affirmative action aspects of the rules under consideration here support rather than negate their validity. We agree with the opinions in *Gomes* and *MIAA* that the sponsoring by public schools of volleyball teams exclusively for girls is not *per se* invalid.

■ Thus, we finally arrive at the ultimate issue of whether public school volleyball teams and tournaments exclusively for girls are constitutionally permissible when no similar volleyball program is sponsored for boys. Both *Gomes* and *MIAA* indicate that such is not the case. Both apparently recognize that the inherent physical differences between the sexes justify having separate girls' teams in those sports where those differences are of substantial significance. However, in order to do so, they deem it necessary for the school to also provide an opportunity for boys to exercise the skills which are unique to the game involved. They would require that this be done either by having a separate team for boys or permitting some participation by boys on the girls' team. Plaintiff assumes arguendo, but does not concede, that separate teams are permissible, and argues along a similar line.

We suggest that having separate teams yet giving each boy an opportunity to exploit his talents unique to the game played by girls presents a more difficult problem than *Gomes* and *MIAA* would indicate. *Gomes* assumes that baseball and softball are games where the skills are not unique to each other. While the fielding skills are quite similar, the pitching skills are quite different. There is no place for a good softball pitcher on a baseball team. Batting skills are not parallel either. Many batters can hit underhand pitches but not overhand. Some good softball hitters lack the courage to bat effectively against a hard-throwing baseball pitcher. In Massachusetts, a good male field hockey player who could not skate could claim a right to play field hockey although ice hockey was offered for boys. To carry the theory to its logical conclusion, a male discus thrower with hands too small to grip the boys' discus could claim a right to participate in the girls' event which uses a smaller discus.

Plaintiff, *Gomes*, and *MIAA* all suggest a means of giving boys an opportunity to play volleyball through a quota system. *Bakke* would seem to suggest that a classification which is otherwise unconstitutional cannot be made constitutional by a quota system. Furthermore, volleyball with quotas as to gender raises the question of the proper height of the net to accommodate the general size disparities between the sexes. When volleyball with gender quotas as to players has been played for recreation, spiking by men has been barred. When it has been played professionally, the females have been relegated to the back court. Either way, the game is watered down to the detriment of females. Each position occupied by a male reduces the female participation and increases the overall disparity of athletic opportunity which generally exists. We reject a quota system as a viable method of equalizing athletic opportunity between the sexes.

We also deem to be unworkable a system whereby boys would be permitted to play on so-called girls' teams in schools where the combination of financial restraints and lack of interest of boys in volleyball dictates having no boys' volleyball team. The IHSA system of tournament play is presumably now designed to give girls the opportunity to enjoy the highly competitive play previously available only to boys. Because of the innate advantage in volleyball which many boys possess over many girls, permitting boys to play under certain circumstances would place a substantial competitive premium upon schools placing themselves in that position. It is unrealistic to assume that IHSA can plan for a fairly conducted tournament with each school free to choose whether, under their particular circumstances, boys should be allowed to compete on their "girls'" team.

Football has been a long-recognized and popular fall high school sport. Regardless of whether girls capable of making the football team

and strong enough to withstand the rigors of the game have a constitutional right to play, it is obvious that at present few of them would find football to present much of an athletic opportunity as a fall sport. The girls' volleyball season overlaps that of football. In *Schlesinger v. Ballard* (1975), 419 U. S. 498, 42 L. Ed. 2d 610, 95 S. Ct. 572, a statutory provision permitting female naval officers to remain longer in grade than certain male officers was upheld as meeting Federal due process requirements because the female officers had no opportunity to go into combat and thus could not get the promotion enhancements available to males who did so. As the female officers in *Ballard* were given longer in grade because they could not go into combat, girls here are given volleyball playing opportunities because they have little if any in football. In *Ballard*, officers of both genders were given advancement opportunities but through different means. Here, students of both genders are given athletic opportunities but through different sports.

In *Hoover v. Meiklejohn* (D. Colo. 1977), 430 F. Supp. 164, while holding that a public high school not having a separate soccer team for girls must, because of Federal constitutional requirements, permit a physically able girl to play on the school soccer team, the court stated that a school might, nevertheless, have a volleyball team exclusively for girls without having a similar team for boys. That court also stated:

> "The importance of an opportunity for both sexes to participate in a total athletic program presenting a variety of choices for those with differing interests and abilities is far different from the importance of an opportunity for a boy to play volleyball or a girl to play football." 430 F. Supp. 164, 171.

We have presented what we believe to be the factors justifying a public institution having separate athletic teams for girls and have noted no case determining the practice to be necessarily invalid. We conclude that to furnish exactly the same athletic opportunities to boys as to girls would be most difficult and would be detrimental to the compelling governmental interest of equalizing general athletic opportunities between the sexes. We recognize that section 18 imposes a stiffer test than do Federal constitutional requirements, but we consider the equalization of general athletic opportunities to be the essence of the application of that section to the public schools of the State and a practical, though not absolute, necessity that this be so.

We note that one delegate voting for section 18 stated that he did so with confidence that the courts would give it a reasonable interpretation (5 Record of Proceedings, Sixth Illinois Constitutional Convention 3677). We have tried to do so here. We affirm.

Affirmed.

TRAPP, J., concurs.

Mr. JUSTICE CRAVEN, dissenting:

The question presented by this case is whether a public school in Illinois may deny a boy a chance to compete for membership on its volleyball team solely on the basis of his sex when all girls are eligible to so compete and no boys' team is provided. The answer must be "no."

Even the Federal cases, relying upon the general due process and equal protection clauses of the United States Constitution, have narrowly limited sex-based discrimination. The United States Supreme Court has stated that " ' "classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives." ' " (*Orr v. Orr* (1979), 440 U.S. 268, 279, 59 L. Ed. 2d 306, 319, 99 S. Ct. 1102, 1111.) In Illinois, in view of our specific constitutional mandate against sex discrimination, the prohibition is even stronger. In upholding this court's rejection of a State statute which discriminated against males by subjecting them to criminal prosecution at an age younger than that for criminal prosecution of females, the Illinois Supreme Court said:

"[W]e find inescapable the conclusion that it [article I, sec. 18, of the Constitution of 1970] was intended to supplement and expand the guaranties of the equal protection provision of the Bill of Rights and requires us to hold that a classification based on sex is a 'suspect classification' which, to be held valid, must withstand 'strict judicial scrutiny.' " *People v. Ellis* (1974), 57 Ill. 2d 127, 132-33, 311 N.E.2d 98, 101.

The rule which bars plaintiff Petrie from competing at volleyball in this case is not really even a school regulation. Rather, the school is denying this young man access to athletic competition in deference to the rules of the Illinois High School Association (IHSA), a private organization which for practical purposes appears to be setting public educational policy. It behooves the court and the member schools to ask by what warrant the IHSA from its position of anonymity determines which of our young men and women shall be allowed access to the rights and privileges of public education.

It appears from the pleadings that IHSA is funded by public funds—membership fees from the schools derived from taxes, and receipts from athletic contests on school or other public property. IHSA seems to enjoy the best of both worlds—use of public funds and public facilities and, indeed, effective control of educational policy in the field of athletics, yet it enjoys immunity from public control and even from public scrutiny. The IHSA seems to be performing in an area that even a beginning civics student would think government would have sole responsibility. Perhaps at least one affirmative benefit of this litigation will be legislative examination of this unique and powerful role by a private organization in governmental affairs.

Can this privately adopted and imposed classification by sex withstand "strict scrutiny" after it is implemented by the defendant school board? The Federal courts have long rejected categorizations based upon outmoded concepts of the respective capabilities and inclinations of the sexes. *Reed v. Reed* (1971), 404 U.S. 71, 30 L. Ed. 2d 225, 92 S. Ct. 251 (invalidating an Idaho statute that gave mandatory preference to males over females in the appointment of estate administrators); *Stanley v. Illinois* (1972), 405 U.S. 645, 31 L. Ed. 2d 551, 92 S. Ct. 1208 (overturning an Illinois statute which effectively presumed the unfitness of unmarried fathers to care for their children in the event of the mother's death); *Frontiero v. Richardson* (1973), 411 U.S. 677, 36 L. Ed. 2d 583, 93 S. Ct. 1764 (overturning a Federal statute limiting the right of a female member of the uniformed services to claim her spouse as a dependent, where males were subject to no such limitations); *Weinberger v. Wiesenfeld* (1975), 420 U.S. 636, 43 L. Ed. 2d 514, 95 S. Ct. 1225 (invalidating a social security provision denying insurance benefits to surviving widowers with children in their care while authorizing benefits to widows with children in their care); *Stanton v. Stanton* (1975), 421 U.S. 7, 43 L. Ed. 2d 688, 95 S. Ct. 1373 (declaring invalid a State statute that provided for support payments to a female child of a divorced parent until age 18 while providing for the same payments to a male child until age 21); *Craig v. Boren* (1976), 429 U.S. 190, 50 L. Ed. 2d 397, 97 S. Ct. 451 (overturning an Oklahoma statute prohibiting the sale of 3.2 percent beer to males under the age of 21 while allowing its sale to females of age 18 and above); *Califano v. Goldfarb* (1977), 430 U.S. 199, 51 L. Ed. 2d 270, 97 S. Ct. 1021 (rejecting the payment, under the Federal Old-Age, Survivors, and Disability Insurance Benefits law, of benefits to all eligible widows but to widowers only where the widower had received at least one-half of his support from his deceased wife); *Orr v. Orr* (1979), 440 U.S. 268, 59 L. Ed. 2d 306, 99 S. Ct. 1102 (overturning an Alabama statute that said only women could claim alimony after a divorce).

Moreover, numerous Federal decisions stand for the specific proposition that students may not be denied access to the full range of the public school athletic program solely on the basis of sex. *Brenden v. Independent School District 742* (8th Cir. 1973), 477 F.2d 1292; *Gomes v. Rhode Island Interscholastic League* (D. R.I. 1979), 469 F. Supp. 659 (subsequently declared moot by the United States Court of Appeals, First Circuit, Docket No. 79-1181, August 31, 1979); *Yellow Springs Exempted Village School District Board of Education v. Ohio High School Athletic Association* (S.D. Ohio 1978), 443 F. Supp. 753; *Hoover v. Meiklejohn* (D. Colo. 1977), 430 F. Supp. 164; *Cape v. Tennessee Secondary School Athletic Association* (E.D. Tenn. 1976), 424 F. Supp. 632; *Gilpin v. Kansas*

*State High School Activities Association, Inc.* (D. Kan. 1973), 377 F. Supp. 1233.

Though the defendants in this case have made much of the fact that most of the athletic cases involve suits by girls who have been excluded from boys' teams, there can no longer be any question but that freedom from discrimination is a two-way door. As the Supreme Court noted with reference to racial discrimination in *Regents of the University of California v. Bakke* (1978), 438 U.S. 265, 290, 57 L. Ed. 2d 750, 771, 98 S. Ct. 2733, 2748, "If both are not accorded the same protection, then it is not equal"; or, as Justice Powell stated in his concurring opinion:

> "It is far too late to argue that the guarantee of equal protection to *all* persons permits the recognition of special wards entitled to a degree of protection greater than that accorded others." (438 U.S. 265, 295, 57 L. Ed. 2d 750, 774, 98 S. Ct. 2733, 2751.)

*Stanley, Weinberger, Craig, Goldfarb,* and *Orr* all overturned statutes discriminating against men and in favor of women. In *Hoover,* where the complainants happened to be female students excluded from the soccer team, the court noted that numerous sports not involved in the litigation were sex segregated, among them the all-girl volleyball competition, but nevertheless ruled: "What is required is that whatever opportunity is made available be open to all on equal terms." (430 F. Supp. 164, 171.) In *Gomes,* which arose from a fact situation virtually identical with that in the instant case, the Federal District Court for the District of Rhode Island ordered that a qualified male be allowed to compete for a space on the formerly all-girl volleyball team.

The difficulty with the defendants' position is that they are attempting to achieve a laudable goal—ensuring a chance for athletic competition to both large and small, strong and weak students—by an impermissible means. While it may in fact be true that most boys are generally larger and stronger than most girls, due process bars classifications based upon such permanent presumptions where individual determinations may, and in fact do, rebut them. (*Yellow Springs; Hoover.*) Sex-based generalizations have been discarded in many cases where there was statistical support for the presumption upon which the classifications were based. In *Reed,* for instance, the court was unwilling to tolerate a mandatory preference for males over females as estate administrators, even while acknowledging that men, as a class, may indeed be more conversant with business. In *Frontiero, Goldfarb, Stanton,* and *Weinberger,* classifications based upon the presumption that men are more likely than women to be the support of their families were overturned, even though, as the court noted in *Weinberger,* there is some empirical support for that generalization. (420 U.S. 636, 645, 43 L. Ed. 2d

514, 523, 95 S. Ct. 1225, 1231-32.) In fact, as the court noted in *Craig*, where the necessity of barring the sale of 3.2 percent beer to males under 21 and females only under 18 was urged in reliance on traffic safety and arrest statistics, the weakness of such statistics as predictors of any one individual's behavior "merely illustrates that proving broad sociological propositions by statistics is a dubious business, and one that inevitably is in tension with the normative philosophy that underlies the Equal Protection Clause." 429 U.S. 190, 204, 50 L. Ed. 2d 397, 411, 97 S. Ct. 451, 460.

Defendants here argue that boys must be excluded from the all-girl volleyball team in order to allow the girls a fair chance to compete. In support of their position, they cite statistics on the relative height, strength, and physical development of the average male and the average female of high school age. In short, their position is actually not that they are protecting girls frcm boys or vice versa, but rather that they are protecting weaker from stronger athletes. The fallacy in their position is revealed by the fact that, although the differences in size and strength *within* each sex are shown by the evidence to be greater than the differences *between* the averages for the two sexes, no provision has been made to protect smaller, weaker females from competition with larger, stronger females, or smaller, weaker males from competition with larger, stronger males. It was just such a failure which prompted the court in *Hoover* to reject the school district's alleged rationale for its sexually discriminatory policy.

In rejecting a high school athletic association rule barring mixed sex competition in Pennsylvania, the court, ruling on the basis of a constitutional prohibition against sex discrimination very much like ours, noted:

> "The existence of certain characteristics to a greater degree in one sex does not justify classification by sex rather than by the particular characteristic." (*Commonwealth of Pennsylvania v. Pennsylvania Interscholastic Athletic Association* (1975), 18 Pa. Commw. 45, 52, 334 A. 2d 839, 843.)

Similar sentiments were expressed in *Hoover, Yellow Springs, Gilpin,* and *Brenden.*

Surely, not even the majority here, nor society generally, would condone the exclusion of blacks from an all-white basketball team on the grounds that blacks generally are more skilled at the game than whites and might tend to dominate it. Nor would we tolerate an exclusion of Catholics from an all-Protestant high school soccer team on the grounds that Catholic elementary schools have traditionally emphasized that sport so as to give their graduates an unfair advantage. Yet the constitutional prohibition against sex discrimination in Illinois is *more specific* than that

against either racial or religious discrimination. There are legally tolerable means of categorizing athletes by size, strength, and ability. To adopt sex as a proxy for more precisely defined means of leveling off competition is both illegal and irrational. It is simply foolish to perpetuate the fear of equality between sexes. It is more than foolish to justify discrimination upon the asserted basis of protection and allowing "catch up" time.

This litigation started to see whether Trent Petrie could play volleyball when the only volleyball team available was one limited to girls. Ironically, the majority opinion of Mr. Justice Green recognizes that some girls may be better volleyball players than some boys, and indeed on this particular team such may be the fact. Trent Petrie may not have made the team based upon criteria unrelated to sex. The majority opinion is but a labored effort to defend and approve a classification that is proscribed. As Mr. Justice Stevens stated in *City of Los Angeles v. Manhart* (1978), 435 U.S. 702, 708-09, 55 L. Ed. 2d 657, 665-66, 98 S. Ct. 1370, 1375-76, in speaking of a statute that proscribed discrimination based on sex:

> "It precludes treatment of individuals as simply components of a racial, religious, sexual, or national class. If height is required for a job, a tall woman may not be refused employment merely because, on the average, women are too short. Even a true generalization about the class is an insufficient reason for disqualifying an individual to whom the generalization does not apply.
>
> * * *
>
> Even if the statutory language were less clear, the basic policy of the statute requires that we focus on fairness to individuals rather than fairness to classes."

Finally, the ultimate cruel element in the discrimination approved is that the majority seeks to "protect" females because of an implied conclusion that "they" are again to be classified as weak and inferior. Because females are deemed to be weak and inferior, the majority concludes that they need to be special wards protected by this misplaced, gratuitous, judicial benevolence. I prefer to be identified with such reasoning only in dissent.