Edward **KLECZEK** et al.

v.

**RHODE ISLAND INTERSCHOLASTIC LEAGUE, INC., et al.**

**No. 91–500–Appeal.**

Supreme Court of Rhode Island.

July 17, 1992.

Robert D. Parrillo, Hanson, Curran, Parks & Whitman, Providence, for plaintiffs.

Paul Ward, James McAleer, McAleer & McAleer, Providence, David J. Kehoe, Warwick, James R. Lee, Sp. Asst. Atty. Gen., Jeffrey Greer, Asst. Atty. Gen., for defendants.

## OPINION

PER CURIAM.

This matter was before the Supreme Court for oral argument pursuant to our order issued to the plaintiffs and the defendant below to appear and show cause why the issues raised in this appeal should not be summarily decided.

In this case defendant, Rhode Island Interscholastic League, Inc. (the league), appeals from a Superior Court judgment in favor of plaintiffs, Edward and Alyce Kleczek, on behalf of their son, Brian. The plaintiffs had filed a complaint in Superior Court seeking to enjoin the league from enforcing rules and regulations denying their son the opportunity to participate in interscholastic competition as a member of his high school girls' field-hockey team. Brian was sixteen years old at the time this petition was filed and remains enrolled in South Kingstown High School, which is a member of the league.[1]

The plaintiffs petitioned the league for a waiver of the rule that prohibited boys from participating in girls' field hockey. The league denied plaintiffs' request. The plaintiffs then sought a preliminary injunction in the Federal District Court for Rhode Island, basing their claim on the equal-

protection clause of the United States Constitution and Title IX (20 U.S.C. § 1681). After denial of a preliminary injunction by the Federal District Court, plaintiffs brought an action in the Superior Court seeking an injunction under article 1, section 2, of the Rhode Island Constitution and under G.L.1956 (1988 Reenactment) § 16–38–1.1. The trial justice granted plaintiffs' prayer for preliminary and permanent injunction. The trial justice, after a review of the new constitutional provisions, determined that "strict scrutiny" review should be applied to gender classifications. The trial justice also concluded that the league had no compelling reason not to permit males to compete in female sports.

On appeal to this court a stay of the Superior Court's decision was entered following a conference with a single justice of this court pursuant to Rule 16(h) of the Supreme Court Rules of Appellate Procedure. After review of the memoranda submitted and after conference with counsel, the parties were ordered to show cause at oral argument why the issues raised in this appeal should not be summarily decided.[2]

Before us the league argues that the trial justice incorrectly determined that there was sufficient state action to warrant constitutional review and also that the trial justice misinterpreted the Rhode Island Constitution by applying the strict-scrutiny standard to classifications based on gender. For the reasons given below, we vacate the injunction entered by the Superior Court and we remand the case to the Superior Court for reconsideration.

## I

### State Action

The league is funded by dues from participating schools, a majority of which

---

1. The league is a nonprofit corporation composed of a number of secondary schools, the majority of which are public schools. The league supervises and controls the various athletic programs conducted by its members. Rhode Island Interscholastic League Rules and Regulations, article 25, section 1 (1989–1991 Ed.) prohibits boys from playing on the girls' field hockey team. Field hockey is not offered as a boys' sport.

2. Motions for leave to submit an amicus brief have been filed by the Urban League of Rhode Island, The Rhode Island Commission on Human Rights, The Rhode Island Advisory Commission on Women, The Socio–Economic Development Center for South East Asians, Rhode Island Working Women, and the Rhode Island Protection and Advocacy System, Inc. The motions have been granted and the briefs submitted have been considered.

are public schools. Interscholastic league games are held in public school arenas. State funds support most of the schools that use the league to run interscholastic competition. The league has adopted rules and regulations that are followed by all of the member schools under penalty of sanctions by the league. The rules prohibit boys from playing on the girls' field-hockey team. The principal of each member school signs a pledge that he or she will abide by the league's rules. If a member school allowed a boy to play on a girls' team, the league could impose a sanction such as forfeiture of the games the boy played.

On the basis of these facts, we are persuaded that the Rhode Island Interscholastic League has sufficient contact with the state so that its rules and regulations can be considered state action. We agree with the reasoning of cases like *Clark v. Arizona Interscholastic Association*, 695 F.2d 1126 (9th Cir.1982), where the court held that the voluntary association of all public and most private schools was so intertwined as to amount to state action. *Id.* at 1128. We note that the precise issue of "state action," as applied to the league, has never actually been decided by this court. Of interest, however, is our holding in *Hebert v. Ventetuolo*, 480 A.2d 403 (R.I.1984). *Hebert* concerned the league rules regarding transfer of hockey players from one school to another. Although we were not called upon to so hold, the existence of state action was implicit in our consideration of the constitutional issues raised in that case. Also of interest is the holding in *Gomes v. Rhode Island Interscholastic League*, 469 F.Supp. 659, 661 (D.R.I.), *vacating as moot*, 604 F.2d 733 (1st Cir.1979), in which the Federal District Court for Rhode Island held that actions of the league constituted state action within the purview of 42 U.S.C. § 1983. Thus there is sufficient state action involved in the regulation of interscholastic competition to warrant our further consideration.

**II**

**Equal Protection**

Next we turn to a discussion of the more complicated equal-protection issue. The major issue before us involves the meaning of that portion of article 1, section 2, of the Rhode Island Constitution, which provides:

"No person shall be deprived of life, liberty or property without due process of law, nor shall any person be denied equal protection of the laws. No otherwise qualified person shall, solely by reason of race, gender or handicap be subject to discrimination by the state, its agents * * *."

The plaintiffs argue that the "old" status of equal protection in Rhode Island no longer applies. They note, correctly, that before our current constitution was ratified in 1986, there was no specific provision for equal protection in the Rhode Island Constitution. Equal protection did exist, however, and the standard applied was the same as the jurisprudence developed by the United States Supreme Court concerning Fourteenth Amendment equal protection.[3]

The United States Supreme Court's decisions regarding equal protection employ three levels of analysis to determine if a statute or a state-supported rule violates equal protection. The most searching level of analysis is called strict scrutiny. This level of analysis is applied to racial and ethnic classifications and requires that in order "to pass constitutional muster, [the classifications] must be justified by a compelling governmental interest and must be 'necessary * * * to the accomplishment' of their legitimate purpose." *Palmore v. Sidoti*, 466 U.S. 429, 432–33, 104 S.Ct. 1879, 1882, 80 L.Ed.2d 421, 425 (1984); *Loving v. Virginia*, 388 U.S. 1, 11, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010, 1017 (1967). Strict-scrutiny review is applied to all statutes and state-supported rules that classify individuals by race or ethnicity. Classifications by race or ethnicity demand strict scrutiny because no situation justifies the state from classifying individuals by race or ethnicity. Classifying persons according

---

**3.** *See Waldeck v. Piner*, 488 A.2d 1218, 1220 (R.I.1985); *Boucher v. Sayeed*, 459 A.2d 87, 91 (R.I.1983); *State v. Ware*, 418 A.2d 1, 3 (R.I. 1980).

to race or ethnicity is more likely to reflect prejudice than legitimate public concern. Thus the strict-scrutiny analysis is applied, and almost without exception racial or ethnic classifications are struck down as violations of equal protection.

The next level of analysis is called intermediate scrutiny. It is undisputed that intermediate scrutiny is applied to gender classifications. Intermediate scrutiny requires "that classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives" in order to be constitutional. *Craig v. Boren*, 429 U.S. 190, 197, 97 S.Ct. 451, 457, 50 L.Ed.2d 397, 407 (1976). Classifications by gender deserve intermediate scrutiny because most, although not all, gender classifications by the state are not justified. Thus intermediate scrutiny is applied, and classification by gender will only be upheld if the state can demonstrate an important government objective.

The final analysis applied in equal-protection jurisprudence is called the rational-basis test. According to this standard, the classification is evaluated to determine if the state had any rational basis for enacting the classifications at issue in the particular statute. *See McGowan v. Maryland*, 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393, 399 (1961). Economic and social regulation is considered the classic area where rational-basis analysis is applied. Rational-basis review is considered appropriate in these situations because the classifications tend to be based on articulable differences rather than on prejudice. Thus in the majority of these cases the equal-protection clause is not violated, and the statute or the state-supported rule is upheld.

We also note that the equal-protection clause of the Fourteenth Amendment to the United States Constitution is implicated only when a classification treats persons similarly situated in different ways. *Reed v. Reed*, 404 U.S. 71, 75–76, 92 S.Ct. 251, 253–54, 30 L.Ed.2d 225, 229 (1971). Moreover the equal protection clause does not "demand that a statute necessarily apply equally to all persons. * * * '[Or] require [that] things which are different in fact * * * to be treated in law as though they were the same.'" *Rinaldi v. Yeager*, 384 U.S. 305, 309, 86 S.Ct. 1497, 1499, 16 L.Ed.2d 577, 580 (1966). A statute will be upheld "where the gender classification is not invidious, but rather realistically reflects the fact that the sexes are not similarly situated in certain circumstances." *Michael M. v. Superior Court of Sonoma County*, 450 U.S. 464, 469, 101 S.Ct. 1200, 1204, 67 L.Ed.2d 437, 442, (1981).

The plaintiffs argue here, as the trial justice held below, that under the present Rhode Island Constitution strict-scrutiny review should be applied to gender classifications. The trial justice justified the application of strict-scrutiny review on the fact that in the nondiscrimination provision contained in article 1, section 2, of the Rhode Island Constitution, the classifications for gender and disability are placed alongside the classification for race. Since it is well established that race is a suspect classification that receives strict-scrutiny review, the trial justice reasoned that because gender was placed next to race, it followed that gender was also a suspect classification that required strict-scrutiny review.

The plaintiffs also argue that the placement of classifications for race and gender in the new constitution has accomplished what amounts to the enactment of an equal rights amendment (ERA) to our constitution, thereby making gender-based classifications suspect, and requiring strict scrutiny. We cannot accept plaintiffs' contentions that gender classifications require strict-scrutiny review and that the constitutional convention adopted an ERA.

■ As support for its argument that strict-scrutiny review should apply to gender classifications, plaintiffs cite *Attorney General v. Massachusetts Interscholastic Athletic Association*, 378 Mass. 342, 393 N.E.2d 284 (1979) (hereinafter *MIAA* ). In that case the Massachusetts Supreme Judicial Court considered whether a rule promulgated by the Massachusetts Interscholastic Athletic Association that prevented boys

from playing on girls' high school athletic teams violated art. 1, sec. 2, of the Massachusetts Constitution. That section of the constitution provides in pertinent part that "[e]quality under the law shall not be denied or abridged because of sex, race, color, creed or national origin." [4]

In *MIAA* the court determined that the athletic association's rule is "subject to a degree of scrutiny 'at least as strict as the scrutiny required by the Fourteenth Amendment for racial classifications.'" 378 Mass. at 354, 393 N.E.2d at 291. The court rejected the argument that boys and girls have different athletic capacities when it stated "[n]o doubt biological circumstance does contribute to some overall male advantages. But we think the differences are not so clear or uniform as to justify a rule in which sex is sought to be used as a kind of 'proxy' for a functional classification." *Id.* at 357, 393 N.E.2d at 293. Moreover, the court also rejected arguments that the classifications could be justified on safety grounds and that participation by boys in girls' sports would eventually lead to a reduction in athletic opportunities for girls. *Id.* at 359–60, 393 N.E.2d at 293–95. In *MIAA*, the court did not find that the state had a compelling interest to prevent boys from participating on girls' teams and therefore held that athletic-association rules were unconstitutional. *Id.* at 363, 393 N.E.2d at 296.

We disagree with the reasoning presented in *MIAA*. We think the better rule is to apply intermediate scrutiny to gender classifications. The development of Rhode Island equal-protection law is different from the development of Massachusetts' equal-protection law in several respects. Rhode Islanders' adopted an equal-protection clause and an antidiscrimination clause when they adopted art. 1, sec. 2, of the Rhode Island Constitution. Massachusetts, on the other hand, adopted an equal-protection clause that was specifically intended to function as an ERA. As is fully explained later in this opinion, it is clear that Rhode Islanders' did not adopt such a measure.

Moreover, the constitutional amendment that became art. 1, sec. 2, was passed to bring Rhode Island equal-protection law on par with federal equal-protection law. It is clear that federal equal-protection law requires intermediate scrutiny for gender classifications. We are of the opinion that the reasoning for applying intermediate scrutiny to gender classifications is clear and persuasive. Gender classifications do not receive the strict-scrutiny review that racial or ethnic classifications require because racial or ethnic classifications are never justified because they are usually arbitrary classifications that are motivated by prejudice. Gender classifications, on the other hand, may in limited instances be motivated by a legitimate governmental interest rather than prejudice. The analysis applied under the intermediate-scrutiny test is sufficient to uncover any impermissible motivations for gender classifications.

We are also of the opinion that intermediate-scrutiny is particularly appropriate for gender classifications that effect athletic opportunities for boys and girls. Because of innate physiological differences, boys and girls are not similarly situated as they enter athletic competition. Some classifications based on gender may therefore be justified. The classifications can reflect reasoned judgments rather than prejudice.

As support for the opinion that boys and girls are not similarly situated as they enter athletic competition, we cite *Petrie v. Illinois High School Association*, 75 Ill. App.3d 980, 31 Ill.Dec. 653, 394 N.E.2d 855 (1979). In that case an Illinois Appellate Court was asked to consider whether a rule promulgated by the Illinois High School Association that prevented boys from playing on girls' teams violated art. 1, sec. 18, of the Illinois Constitution. That section of the constitution provides in pertinent part, "The equal protection of laws shall not be denied or abridged on account of sex by the State or its units of local government and

---

**4.** It is important to note that art. 1, sec. 2, of the Massachusetts Constitution was adopted specifi-

cally as an ERA. *See* note 6 *infra.*

school districts." [5] The *Petrie* court noted that "there is a long-standing international and national tradition of having separate teams for males and females." 75 Ill. App.3d at 987, 31 Ill.Dec. at 659, 394 N.E.2d at 861. The plaintiffs would surely respond to this statement by arguing that it represents archaic and overbroad generalizations, *see Schlesinger v. Ballard,* 419 U.S. 498, 507, 95 S.Ct. 572, 577, 42 L.Ed.2d 610, 618 (1975) or "romantic paternalism," *Frontiero v. Richardson,* 411 U.S. 677, 684, 93 S.Ct. 1764, 1769, 36 L.Ed.2d 583, 590 (1973). We think not. The tradition of having separate teams is based on a realization that "high school boys are substantially taller, heavier and stronger than their girl counterparts." *Petrie,* 75 Ill.App.3d at 987, 31 Ill.Dec. at 659, 394 N.E.2d at 861. Thus the classifications are based on the realization that distinguishing between boys and girls in interscholastic sports will help promote safety, increase competition within each classification, and provide more athletic opportunities for both boys and girls.

In the present case under the standard we adopt, it must be determined whether the league's rule that prevents boys from participating in girls' interscholastic teams serves important governmental objectives and is substantially related to those objectives. Although it will be for the trial justice to determine this issue, we would comment on what constitutes an important governmental interest. We are of the opinion that the promotion of safety and the preservation of interscholastic athletic competition for both boys and girls constitute an important governmental interest.

Next we turn to a discussion of whether art. 1, sec. 2, of the Rhode Island Constitution constitutes the adoption of an ERA. It is well established that in construing constitutions, our task is to give effect to the intent of the framers. *State ex rel. Webb v. Cianci,* 591 A.2d 1193, 1201 (R.I.1991); *In re Opinion to the House of*

*Representatives,* 45 R.I. 289, 120 A. 868 (1923). Moreover, in doing so, it is appropriate for us to consult whatever extrinsic sources of information are available, such as proceedings of the Constitutional Convention itself, and legislation, if any is available, relating to the constitutional provision in question. *Webb,* 591 A.2d at 1201.

It is enlightening to read the minutes of the Constitutional Convention session of June 5, 1986, the session at which the language in question, in the form of a resolution, was reported out of the Committee on Citizen Rights. It was adopted by the convention the same day by a vote of fifty-eight to thirty-seven. Those who spoke on the committee report did not suggest that the delegates were considering an ERA with all the legal and constitutional ramifications that such an amendment would entail. Rather the committee had considered and tabled all resolutions relating to ERA's "because of problems with language and interpretation." Such an amendment was never reported out of committee. The resolution reported out was designed and intended by the committee to be "conservative" in nature. It was intended to deal with "prevention of discrimination with regard to employment, housing and salaries, for example." The speakers were adamant that the resolution had nothing to do with the issue of abortion, which an ERA would most likely encompass.

Reference was made to testimony from an official of the AFL–CIO that discrimination on account of gender is wrong in principle but nonetheless, continues to be a fact of life. Another speaker said that "there is no single governmental act that more perfectly expresses a firm enduring commitment to equal protection for women than stating that commitment in the constitution of Rhode Island." The same speaker referred to the concern of some members that the language used might be interpreted by some to go far beyond its intended scope.

---

**5.** We note that art. 1, sec. 18, of the Illinois Constitution was adopted specifically as an ERA. *See* note 6 *infra.*

Another delegate commented that "there may be some who will say that this resolution is not necessary, that the courts are already giving adequate protection against such discrimination. To the extent that this may be true, I believe that this constitution ought to catch up with the courts. To the extent that the courts are inconsistent with regard to discrimination issues, this will provide direct and clear guidance. To the extent that the existing state statutory restraints against discrimination can be easily changed, this resolution will provide a more enduring affirmation that discrimination on the basis of race or gender is wrong."

The record of that session supports the argument that the delegates themselves knew that they were not acting on an ERA but rather on a resolution that would prohibit discrimination based on race, gender, or disability. There was reference in the debate to equal rights, the equal-rights protections that our citizens already enjoyed but which were not spelled out verbatim in our constitution. One delegate said that this was "a watered down, a very watered down ERA," a description that is fatal to the arguments that the Constitutional Convention intended to act on an ERA as such.

Moreover, our review of those states that have adopted ERA's disclosed that in each instance adoption occurred only after full debate and with notice to all and by calling the resolution what it was, the Equal Rights Amendment.[6] Adoption of such an amendment has never occurred by accident, by inadvertence, by indirection, or by a subterfuge.

It is clear to us that the delegates to our Constitutional Convention did not vote on an ERA and did not propose one to the people for ratification. Such a resolution was never reported out of committee. To argue that we have adopted what is in effect an ERA in article 1, section 2, is to argue a proposition that has no foundation in fact.

We are of the opinion that the convention proposed, and the people ratified, an equal-protection clause and an antidiscrimination clause, that were intended to fill a void that had existed in our constitution up until that time. This intention was best described by the delegate quoted previously when she said that the resolution under discussion would enable the constitution to catch up with the decisions of the courts, would give uniform guarantees of equal protection to all our citizens, and would make it difficult to amend or abridge that right by placing the specific guarantee into the constitution.

■ We conclude, therefore, that article 1, section 2, of the Rhode Island Constitution is an adoption by this state of an equal-protection and nondiscrimination clause that contains protections similar to the equal-protection guarantees contained in the Fourteenth Amendment to the United States Constitution. The last sentence of that section, which specifically mentions race, gender, and handicap, enunciates the guarantees that have been spelled out in numerous court decisions and by statutes enacted over the years since the Fourteenth Amendment was ratified. The record of the constitutional convention and the language of the amendment itself persuade us that the convention had no intention of acting beyond that point. We also conclude that the enumeration of "race, gender and handicap" was not intended to mandate, nor does it require us to consider, issues of classification, raised under these constitutional guarantees, in any way different from our actions prior to 1986 when we addressed issues of race, gender, and handicap. That is to say we shall continue to employ analysis on the basis of strict, intermediate, and rational-basis review de-

---

**6.** There are seventeen states that have adopted ERA articles in their constitutions, Utah in 1896, Wyoming in 1890 and fourteen additional states between 1970 and 1976. They are Alaska, Colorado, Connecticut, Hawaii, Illinois, Louisiana, Maryland, Massachusetts, Montana, New Mexico, Pennsylvania, Texas, Virginia, and Washington.

Only thirty-five of the needed thirty-eight states had ratified the Equal Rights Amendment to the United States Constitution by June 20, 1982, the date upon which the ratification deadline had passed. Later the extended deadline for ratification, June 30, 1982, also passed without sufficient ratification by the states.

pending upon the classification involved in the controversy.

For these reasons the defendant's appeal is sustained, the injunction granted by the Superior Court is vacated, and the papers of this case are remanded to the Superior Court for reconsideration of the constitutional issues based on our interpretation of the meaning of article 1, section 2, of the Rhode Island Constitution.

MURRAY, Justice, dissenting.

I believe that cause has not been shown and that the constitutional issues have been properly addressed in the trial justice's well-reasoned decision, which granted judgment in favor of the plaintiffs.

Therefore, I would affirm the judgment granting the plaintiffs' prayers for preliminary and permanent injunction, and I do not concur with the remand.