B.C. ON HIS OWN BEHALF AND ON BEHALF OF HIS MINOR SON, C.C., PETITIONER-APPELLANT, v. BOARD OF EDUCATION, CUMBERLAND REGIONAL SCHOOL DISTRICT AND NEW JERSEY STATE INTERSCHOLASTIC ATHLETIC ASSOCIATION, RESPONDENTS-RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued May 13, 1987—Decided September 23, 1987.

Before Judges DEIGHAN, HAVEY and MUIR.

*John T. Barbour* argued the cause for appellant (*Barbour & Costa*, attorneys; *John T. Barbour* on the brief and reply letter brief).

*Michael J. Herbert*, of counsel, argued the cause for respondent New Jersey State Interscholastic Athletic Association (*Sterns, Herbert, Weinroth & Petrino*, attorneys; *Linda K. Stern* on the brief).

*William P. Doherty, Jr.*, attorney for respondent Cumberland Regional School District (*William P. Doherty* on the letter brief).

*Nancy Kaplen Miller,* Deputy Attorney General, argued the cause for respondent Commissioner of Education (*W. Cary Edwards,* Attorney General of New Jersey, attorney; *Arlene Goldfus Lutz,* Deputy Attorney General on the letter brief).

The opinion of the court was delivered by

DEIGHAN, J.A.D.

Petitioner B.C. appeals from a decision of the Commissioner of Education (Commissioner) which determined that petitioner's son, C.C., may not play on the girls' hockey team at Cumberland Regional High School (Cumberland Regional). The underlying issue presented on this appeal is whether the Commissioner was correct in holding that the policy of the New Jersey State Interscholastic Athletic Association (Athletic Association) of prohibiting boys from playing on girls' hockey teams did not deprive C.C. of his rights under the New Jersey Constitution, the New Jersey Law Against Discrimination, *N.J.S.A.* 10:5-1 *et seq.,* and *N.J.S.A.* 18A:36-20 pertaining to equal rights within the education system.

Congress adopted Title IX of the Education Amendments of 1972, 20 *U.S.C.A.* § 1681 *et seq.,* which mandates that all educational institutions receiving federal assistance must provide equal education opportunities without regard to sex. To implement Title IX the New Jersey Department of Education established the Office of Equal Educational Opportunity (OEEO). In 1977 the OEEO collaborated with other agencies and the Athletic Association to develop "athletic guidelines" which were promulgated on September 1, 1978. The guidelines, in the form of questions and answers, were designed to aid schools in rectifying the historical denial of equal opportunities for girls in extracurricular sports.

The Athletic Association is a voluntary association of public and non-public schools formed for the purposes of promoting and regulating interscholastic sports activities. Respondent Board of Education of the Cumberland Regional School District

is a member of the Athletic Association. Member schools such as Cumberland Regional are governed by the Association's rules and regulations the purpose of which, among others, is the equalization of athletic opportunities for females.

During the 1984–85 school year, C.C. participated as a freshman on the Cumberland Regional girls' junior varsity field hockey team. The school did not have a boys' field hockey team. In the fall of that year, Robert Kanaby, executive director of the Athletic Association, received inquiries and complaints from several member schools regarding C.C.'s participation. Member schools of the Athletic Association indicated that if C.C. were permitted to play on the girls' varsity field hockey team, they would actively recruit males for their girls' field hockey teams thereby displacing otherwise eligible girls.

On April 15, 1985, the Athletic Association adopted a resolution by which it provided standards regarding males participating in girls' sports. The relevant standard provides that:

1. Males shall be excluded from female athletic teams although there are no teams for boys in the same sport until such time as both sexes are afforded overall equal athletic opportunities.

The resolution further stated that:

The purposes of section 1 are twofold: (1) the promotion of equal athletic opportunities for females, and (2) to redress the effects of past discrimination and disparate treatment relating to girls' athletics. If boys are permitted to participate on girls' interscholastic athletic teams there would be a substantial risk that boys would dominate the girls' program and thus cause a displacement of girls from participating on those teams. Any displacement of girls from those teams would further limit their opportunities for participation in interscholastic athletics. Further, this policy is constitutionally sound because males have historically enjoyed greater athletic opportunities than have girls. Similarly, boys currently have ample opportunity for participation in interscholastic sports and sufficient avenues for interscholastic participation....

Since the Commissioner did not approve or disapprove this regulation within 20 days, it became effective pursuant to *N.J.S.A.* 18A:11–5.

On August 29, 1985, the Athletic Association sent a letter to Cumberland Regional advising that pursuant to the regulation, C.C. could not participate with the girls' field hockey team.

Petitioner filed a petition with the Commissioner pursuant to *N.J.S.A.* 18A:11–3 to permit his son, C.C., to play on Cumberland Regional's girls' field hockey team.

At a hearing before an Administrative Law Judge (ALJ) C.C. testified that he was very serious about field hockey and that there were limited opportunities for him to play other than at Cumberland Regional. Jean Barry, the field hockey coach at Cumberland Regional, testified that C.C.'s presence on her team caused the other members of the team to work harder. She stated that while C.C. was a freshman only two or three girls, all juniors and seniors, were faster and had greater strength, stamina and endurance than C.C. Ms. Barry admitted that C.C. would displace a girl if he were to participate on the team and also admitted that there was a potential for injuries in field hockey if C.C. played.

Richard Kentwell, an expert witness in field hockey who testified for petitioner, stated that mere size, speed and stamina of the player were not determinative factors in evaluating the skill of field hockey play. Rather, he stated that ability to handle and move the ball were the most important factors. Christopher Maloney, plaintiff's other expert, corroborated Kentwell's testimony.

The Athletic Association's witnesses included Robert Kanaby, Executive Director of the Athletic Association; Richard Neal, Executive Director of the Massachusetts Interscholastic Athletic Association; Barbara Skiba, a field hockey coach at Hopewell Valley Regional High School, and Steven Timko, Athletic Director at Hopewell Valley.

Kanaby testified that allowing the boys to participate on the girls' teams would: impede considerable progress which had been made by the Athletic Association to equalize athletic opportunities; displace girls from athletic teams; be unfair from a competitive standpoint to other teams, and raise serious safety issues, particularly in sports where bodily contact may occur, as in field hockey.

Richard Neal supported Kanaby's testimony. He testified that Massachusetts was the only state in the nation which allows boys on girls teams because of a 1979 decision by the Massachusetts Supreme Judicial Court, mandating that boys be permitted the opportunity to participate on girls' athletic teams.[1] In Neal's opinion, the impact of that decision was a "disaster." He testified that while approximately only 20 to 30 boys have participated on girls' teams since that decision, their impact upon the girls' interscholastic sports has been highly detrimental. Neal testified that permitting boys to play on girls teams caused safety problems and resulted in the intimidation of females which permitted male dominance in volleyball, softball, soccer and field hockey teams. As a result, girls were displaced in sports where they had previously participated. He recounted that on one occasion a girl participant sustained serious injuries as a direct result of a boy's participation in an integrated sport. Neal noted that in the 1985 field hockey season at one school, five senior boys played on the girls' field hockey team. He stated that the boys' presence intimidated other girls' field hockey opponents and, in addition to displacement of girls in integrated sports, other girls were quitting girls' teams as a direct result of boys' participation.

Barbara Skiba, a girls' field hockey coach for 18 years, corroborated both Kanaby and Neal's testimonies that male participation on girls' field hockey teams could result in serious injuries, would intimidate many female participants and displace many girls. Ms. Skiba's testimony was corroborated by Steven Timko, the Athletic Director from Hopewell Valley.

The ALJ, in his written opinion, thoroughly reviewed all of the evidence. He was persuaded by petitioner's witnesses that male participation on girls' field hockey teams would not have a detrimental impact. He concluded, among other things, that

---

[1]*Attorney General v. Massachusetts Interscholastic Athletic Association,* 378 *Mass.* 342, 393 *N.E.2d* 284 (1979) (exclusion of boys from girls' teams prohibited under strict scrutiny mandated by state's equal rights amendment).

the exclusion of C.C. was based solely on his gender; that no substantial public interest was served by the exclusion, and that under the New Jersey Constitution and statutes, discrimination in interscholastic sports based on gender alone is forbidden. He then ordered "that C.C. be allowed to participate as a member of the field hockey team at Cumberland Regional High School so long as, in the coach's judgment, his skills, attitude and team play will contribute to the success of the team and so long as he shall otherwise be eligible."

The Commissioner rejected the ALJ's conclusion that no substantial public interest is served by the exclusion of boys from the girls' hockey team. He was persuaded by the Athletic Association's evidence which indicated that the inclusion of males on girls' field hockey teams would increase the risk of injury, intimidate girls from participation and displace girls from the field hockey team. He concluded that the Athletic Association's policy was substantially related to the important governmental interest of providing overall equal athletic opportunities and therefore determined that C.C. may not participate with the girls' field hockey team.

On appeal petitioner presents the following issues:

POINT I New Jersey State Law, Rule And Constitution Prohibit Barring [C.C.] From Participating On The Cumberland Regional High School Field Hockey Team Solely On The Basis Of His Gender;

POINT II It Was Improper Under The Circumstances Of This Proceeding For The Commissioner Of Education To Make Findings Of Fact That Varied From Those Made By The Administrative Law Judge;

POINT III The Commissioner Erred In Selecting The Legal Standards To Be Utilized In Reversing The Initial Decision Of The Administrative Law Judge;

POINT IV The Commissioner Of Education Erred Below By Failing And Refusing To Comply With The Administrative Procedures Act.

Subpoint A The Administrative Procedures Act Applies In The Instant Matter;

Subpoint B The Fact Of Non-compliance With The Administrative Procedures Act Is Not Being Contested.

I

Under his first contention, petitioner argues that the New Jersey Constitution, the Law Against Discrimination, *N.J.*

*S.A.* 10:5–1 *et seq.*, and *N.J.S.A.* 18A:36–20, which precludes discrimination based on gender in education, prohibit respondents from excluding C.C. from participation on the field hockey team solely on the basis of his sex. Petitioner asserts that these statutes provide greater protection than that afforded by the Equal Protection Clause of the Fourteenth Amendment under the United States Constitution. Accordingly, he contends, that even if the Athletic Association's regulation would pass muster under the United States Constitution, it must fall in the face of the State Constitution, *N.J.S.A.* 10:5–1 and *N.J.S.A.* 18A:36–20.

The phrase "equal protection" does not appear in the New Jersey Constitution. It has long been recognized however, that Article I, paragraph 1 of the State Constitution,[2] like the Fourteenth Amendment, "seeks to protect against injustice and against the unequal treatment of those who should be treated alike." *Greenberg v. Kimmelman,* 99 *N.J.* 552, 568 (1985).

The Law Against Discrimination, *N.J.S.A.* 10:5–1 *et seq.* generally declares "that practices of discrimination ... because of race, creed, color, national origin, ancestry, age, sex, marital status, or because of their liability for service in the Armed Forces of the United States, are a matter of concern to the government of the State", and the State's opposition to such practices of discrimination, *N.J.S.A.* 10:5–3, in "any place of public accommodation." *N.J.S.A.* 10:5–4. Schools are included as "a place of public accommodation". *N.J.S.A.* 10:5–5(*l* ).

*N.J.S.A.* 18A:36–20 provides that "[n]o pupil in a public school ... shall be discriminated against ... in obtaining any advantages, privileges or courses of study of school by reason of race, color, creed, sex or national origin." *N.J.A.C.* 6:4–1.-

---

[2]The New Jersey Constitution, Article I, paragraph 1 provides that "[a]ll persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness."

5(f)(2), promulgated in furtherance of *N.J.S.A.* 18A:36–20, proscribes discrimination in athletic programs.

Under the Fourteenth Amendment of the United States Constitution, classifications based upon gender are subject to an "intermediate scrutiny" test which requires that in order "[t]o withstand constitutional challenge, . . . classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives." *Craig v. Boren,* 429 *U.S.* 190, 197, 97 *S.Ct.* 451, 457, 50 *L.Ed.*2d 397 (1976); *accord Mississippi University for Women v. Hogan,* 458 *U.S.* 718, 724–730, 102 *S.Ct.* 3331, 3336–39, 73 *L.Ed.*2d 1090 (1982).[3]

The analysis of fundamental rights under the New Jersey Constitution differs from the analysis of those rights under the United States Constitution. *Right To Choose v. Byrne,* 91 *N.J.* 287, 308–09 (1982); *accord Greenberg v. Kimmelman,* 99 *N.J.* 552, 567 (1985). The New Jersey Supreme Court has employed a "balancing test" in analyzing rights under our State Constitution, *Robinson v. Cahill,* 62 *N.J.* 473, 491–92, *cert.* den. 414 *U.S.* 976, 94 *S.Ct.* 292, 38 *L.Ed.*2d 219 (1973); *accord Greenberg v. Kimmelman,* 99 *N.J.* 552, 567 (1985); *Barone v. Dept. of Human Services,* 107 *N.J.* 355, 368 (1987), under which the Court considers the nature of the affected right, the extent to which the governmental restriction intrudes upon the right and the public need for the restriction. *Greenberg v. Kimmelman,* 99 *N.J.* at 567; *accord Barone,* 107 *N.J.* at 368. The crucial

---

[3]Petitioner in his third issue contends that the Commissioner erred in applying the standard as enunciated in *Craig v. Boren.* He contends the Commissioner was obliged to apply the standard set forth in *Mississippi University for Women v. Hogan.* Both *Craig* and *Mississippi University* mandate that classifications based on sex are subject to the same standard. In *Mississippi University for Women* the Supreme Court struck down a policy which denied males access to an all-female nursing school on the basis that the state university made no showing that the gender-based classification is substantially and directly related to an objective to compensate for discrimination against women.

issue in each case is "whether there is an appropriate govern-
mental interest suitably furthered by the differential treat-
ment" involved. *Ibid.* "To a large extent, the considerations
guiding our equal protection analysis under the New Jersey
Constitution are implicit in the ... approach applied by the
[United States] Supreme Court under the Federal Constitution."
*Ibid; accord Greenberg v. Kimmelman,* 99 *N.J.* at 567. As
observed by the Court in *Greenberg,* in some cases our analysis
of the New Jersey Constitution may lead to a different result
from that required by the Fourteenth Amendment to the United
States Constitution but in other cases the two constitutions may
point toward the same result. *Greenberg,* 99 *N.J.* at 569.[4]

## II

An analysis under the Fourteenth Amendment of the United
States Constitution requires a determination of whether the
prohibition of boys from girls' athletic teams solely on the basis
of their sex serves an important governmental objective and is
substantially related to the achievement of the objective of
promoting overall athletic equality for both sexes. Under the
State Constitution it is necessary to balance C.C.'s right not to
be discriminated against on the basis of his sex with the public
need to promote equalization of athletic opportunities and to
rectify past discrimination against women in athletics.

The Commissioner pointed out that the athletic guidelines
issued by the OEEO focus "upon maintaining and promoting
opportunities for females in sports, recognizing that overall
athletic opportunities for females have been and continue to be
less than those provided for males." [5] Sex-based classifications

---

[4]*See also Pollock,* Address: State Constitutions as Separate Sources of Funda-
mental Rights, 35 *Rut.L.Rev.* 707 (1983).

[5]We reject petitioner's contention that females at Cumberland Regional have
the same athletic opportunites as males, thus negating the need for application
of the Association's regulations at Cumberland Regional. Cumberland Region-

can withstand constitutional challenge under the Fourteenth Amendment where the actual purpose of the discrimination is to compensate for past discrimination. *Califano v. Webster,* 430 *U.S.* 313, 318, 97 *S.Ct.* 1192, 1195, 51 *L.Ed.*2d 360 (1977). We are convinced that, under the equal protection clause of the Fourteenth Amendment, the challenged determination operates to achieve equality of athletic opportunity for both sexes and to rectify the historical denial of athletic opportunities for women. In our view, the equalization of athletic opportunities for women is an important governmental objective and the Athletic Association's regulation prohibiting males from participating on female teams provides an appropriate and proper means of protecting athletic opportunities for girls in the education system. The Athletic Association's regulation and the OEEO guidelines are substantially related to the achievement of that objective. By excluding males from participation on female high school athletic teams the regulation prevents males from dominating and displacing females from meaningful participation in available athletic opportunities.

We note, as did the Commissioner, that this conclusion is supported by decisions of other jurisdictions: *Clark v. Arizona Interscholastic Association,* 695 *F.*2d 1126 (9th Cir.1982) *cert.* den. 464 *U.S.* 818, 104 *S.Ct.* 79, 78 *L.Ed.*2d 90 (1983); *Mularadelis v. Haldane Central School Board,* 74 *A.D.*2d 248, 427 *N.Y.S.*2d 458 (N.Y.App.Div.1980); *Petrie v. Illinois High School Association,* 75 *Ill.App.*3d 980, 31 *Ill.Dec.* 653, 394 *N.E.*2d 855 (Ill.App.Ct.1979); *Forte v. North Babylon Union*

al offers nine sports exclusively for males and only seven sports exclusively for females. We are aware that the number of teams offered for males and females is but one factor in determining the equality of athletic programs. Nonetheless we are convinced that the goal of equality of athletic opportunity for both sexes will not be achieved by equal athletic opportunities at an isolated school. C.C.'s participation on the girls' field hockey team would have an impact not only at Cumberland Regional but also on competing schools which have not yet achieved equalization of athletic opportunites.

*Free School District Bd. of Ed.,* 105 *Misc.*2d 36, 431 *N.Y.S.*2d 321 (N.Y.Sup.Ct.1980).

In *Clark v. Arizona Interscholastic Association,* the Circuit Court of Appeals had little difficulty in finding that there is a legitimate and important governmental interest in "redressing past discrimination against women in athletics and promoting equality of athletic opportunity between the sexes." 695 *F.*2d at 1131. Specifically the Court determined that the preclusion of male students from becoming members of the girls' volleyball team is a permissible means of redressing the past discrimination against females in high school interscholastic programs. *Id.* at 1128.

The Court then turned to the next question of whether the exclusion of boys from girls' athletic teams is substantially related to the governmental interest. More specifically, it noted that "[t]he question really asks whether any real differences exist between boys and girls which justify the exclusion; i.e., are there differences which would prevent realization of the goal if the exclusion were not allowed." *Id.* at 1131. In answering the question affirmatively the court stated:

> The record makes clear that due to average physiological differences, males would displace females to a substantial extent if they were allowed to compete for positions on the volleyball team. Thus, athletic opportunities for women would be diminished. As discussed above, there is no question that the [United States] Supreme Court allows for these average real differences between the sexes to be recognized or that they allow gender to be used as a proxy in this sense if it is an accurate proxy. [Cited cases omitted] ... The AIA [Arizona Interscholastic Association] is simply recognizing the physiological fact that males would have an undue advantage competing against women for positions on the volleyball team. *Petrie,* 75 Ill.App.3d at 988–89, 31 Ill Dec. at 660, 394 N.E.2d at 862. The situation here is one where there is clearly a substantial relationship between the exclusion of males from the team and the goal of redressing past discrimination and providing equal opportunities for women. [*Ibid.*]

*See also Cape v. Tennessee Secondary School Athletic Association,* 563 *F.*2d 793, (6th Cir.1977) where it was observed that "[i]t takes little imagination to realize that were play and competition not separated by sex, the great bulk of the females

would quickly be eliminated from participation and denied any meaningful opportunity for athletic involvement." *Id.* at 795.

We reach the same conclusion as in *Clark* under the State Constitution and statutes in balancing C.C.'s right not to be discriminated against on the basis of his sex against the public need to promote equalization of athletic opportunities. The governmental interest in promoting equality of athletic opportunites is advanced by the exclusion of C.C.'s participation on the girls' field hockey team. If C.C. is permitted to play on the girls' field hockey team, his personal interest would be attained at the expense of denying females the right to have equality of athletic opportunities with their male counterparts.

Petitioner's contention that C.C.'s right to play field hockey is protected by both the Law Against Discrimination, *N.J.S.A.* 10:5–1 and the educational statute, *N.J.S.A.* 18:36A–20 prohibiting discrimination in education, must also fail. *N.J.S.A.* 10:5–1 has been construed to permit reasonable restrictions which promote important governmental objectives. *See In re Katherine Frey Dickerson,* 193 *N.J.Super.* 353 (Ch.Div.1983). Similarly, we have construed *N.J.S.A.* 18A:36–20 to simply extend the New Jersey constitutional bases of proscribed discrimination in respect to student opportunities to include gender in the education system. *Hinfey v. Matawan Regional Board of Education,* 147 *N.J.Super.* 201 (App.Div.1977), rev'd on other grounds 77 *N.J.* 514 (1978). We did not in that case, as petitioner contends, construe the statute to provide greater rights than those afforded under the State and Federal Constitutions.

In the converse situation where females are excluded from participation in a non-contact sport on a male team, the factors of safety, intimidation and displacement, which render the Athletic Association's regulation substantially related to the achievement of remedying disparate athletic opportunities for women, are not present. See *Clark, supra,* 695 *F.*2d at 1129. *But see E.B. et al v. North Hunterdon Board of Education*

(Agency Dkt. No. 282–85/85, OAL Dkt. No. EDU 5187–85)[6] where the Commissioner recently permitted a girl to participate on a male football team at North Hunterdon High School.

In the present case, the Commissioner distinguished the *North Hunterdon* case and the present case by noting that in the latter situation "the female participant assumed the risk participating in an all-boys' team, thereby making moot the concern for the 'average differences' health and safety concern inherent in a single female's participation on an otherwise all-male football team." He then noted that "[i]n the instant matter, it is the .welfare of the members of the team who are *not* in a position to provide safety waivers, that is, the females who comprise the majority of the girls' teams with which [he was] concerned."

This same distinction was made by Richard Neal who testified on behalf of the Athletic Association. He pointed out that when a girl tries out for a boys' team, she and her parents go in "with their eyes open." However, when a boy or boys participate on a girls' team, opponents do not expect to compete with boys. He noted that opponents are then put upon an unfair choice: they must either compete against boys or forfeit the game.

We conclude that the Athletic Association's regulation excluding males from female teams is constitutionally permissible under both the State and Federal Constitution and is not violative of the New Jersey Law Against Discrimination or the statute prohibiting gender discrimination in education.

---

[6]*In Nat. Org. for Women v. Little League Baseball,* 127 *N.J.Super.* 522 (App. Div.1974) this court held that under the Law Against Discrimination, *N.J.S.A.* 10:5–1 *et seq.* evidence supported a finding that girls between eight and 12 years of age are not as a class subject to a materially greater hazard of injury while playing baseball than boys of the same age group in Little League baseball.

### III

■■■ Petitioner next contends that it was improper under the circumstances of this case for the Commissioner to make findings of fact that varied from those made by the ALJ. More specifically petitioner contends that the Commissioner erred in reversing the ALJ without first having reviewed the transcript of the hearing conducted by the ALJ.

At the conclusion of his initial decision, the ALJ made the following findings and conclusions:

1. Although incidental contact may occur, field hockey is not a contact sport.
2. Safety and equipment requirements for field hockey are not exceptional to such a degree as to require to the exclusion of males from participation on female teams.
3. Stickwork is of greater importance than mere size and speed in field hockey play.
4. Credible testimony established that some Cumberland girls were and are superior to C.C. in certain facets of the sport.
5. The exclusion of C.C. was based solely on his gender.
6. No substantial public interest is served by the exclusion.
7. Cited New Jersey law forbids discrimination based on sex alone.

Both parties filed exceptions to the ALJ's decision. Petitioner's exceptions essentially urged the Commissioner to affirm the ALJ's decision. The Athletic Association filed exceptions objecting to the ALJ's evaluation and summary of its witnesses' testimony before the ALJ. *N.J.A.C.* 1:1–18.4(b),(c). The petitioner filed no reply objecting to the summary of the Athletic Association's witnesses. *N.J.A.C.* 1:1–18.4(d).

Actually the Commissioner disagreed with the ALJ on only the first finding of fact—that field hockey is not a contact sport. Even so, the ALJ noted that "incidental" contact may occur. As pointed out in the Athletic Association's exceptions, the ALJ failed to consider the Athletic Association's witnesses who testified to the contrary on this issue.

In concluding that field hockey is a contact sport, the Commissioner accepted the ALJ's analysis that incidental contact may occur and the recognized fact of physiological differences between boys and girls. He also referred to a letter of Decem-

ber 12, 1985, which was in evidence, RA–14, from Timothy Carroll, President, Cape & Islands Principals' Association, and Allan Sullivan, President, Cape & Islands Athletic Directors' Association, to Mr. Sherman A. Kinney, Associate Executive Director M.I.A.S., which pointed out the problem even if there is only incidental contact:

> 1. *Intimidation and safety factor*—It is a known fact that boys are physically stronger than girls, have the ability to hit the ball harder, throw it farther, run faster, etc. The potential for a 180–pound male athlete sliding into home plate against a 120–pound female catcher exists. The catcher risks injury, or worse, fails to execute the play well because of fear of injury.

We are satisfied that there is no reversible error in the proceeding before the Commissioner. The head of an administrative agency need not review the entire transcript of contested proceedings conducted before the ALJ in all cases, but rather must give attentive consideration to the ALJ's recommendation as part of the record and address the key items of evidence which were crucial to the agency's decision. *Matter of Morrison*, 216 *N.J.Super.* 143, 158 (App.Div.1987), quoting *Public Advocate Dep't v. Public Utilities Bd.*, 189 *N.J.Super.* 491 (App.Div.1983). It is established that administrative law principles allow an agency head to rely upon a summary of the record prepared by a subordinate, or, as here the ALJ. *Morgan v. United States*, 298 *U.S.* 468, 56 *S.Ct.* 906, 80 *L.Ed.* 1288 (1936) (Morgan I); *Guerrero v. State of New Jersey*, 643 *F.*2d 148 (1981); *Matter of Morrison*, 216 *N.J.Super.* at 158.

The deciding officer need not personally read the entire record or transcript but rather is only required to "consider and appraise" a personal understanding of the evidence contained in the record. *Morrison*, 216 *N.J.Super.* at 155 citing *2 Davis, Administrative Law Treatise*, § 11:03 at 44–45 (1958) and *Guerrero v. State of New Jersey*, 643 *F.*2d at 150. The requirement to "consider and appraise" involves a personal understanding of the evidence and not the mechanics by which the understanding is developed. *Davis, supra*, § 11:03 at 45.

*Rowley v. Board of Education of Manalapan-Englishtown,*
205 *N.J.Super.* 65 (App.Div.1985), relied upon by petitioner, is
inapposite. In *Rowley* this court remanded the decision to the
State Board of Education which rejected the findings of the
ALJ and the Commissioner without reviewing the transcripts of
the hearings. Here the Commissioner had before him the
ALJ's comprehensive initial decision which reviewed in specific
detail the testimony of each witness plus twenty documentary
exhibits included in the record. A review of the transcripts
would not have provided the Commissioner with any different
evidence than what he had before him. The Commissioner set
out in full detail his reasons for disagreement with the ALJ and
the basis of his disagreement. His opinion contained a thor-
ough analysis of opinions in other jurisdictions as well as the
analysis of New Jersey Statutes and the athletic guidelines
adopted in April, 1986.

Petitioner's citation of the recent case of *Matter of Opinion
No. 583,* 107 *N.J.* 230 (1987) for the proposition that "[t]he
agency head must base the final decision solely on the record
established at the hearing," *id.* at 233, 238, can be of no solace
to petitioner. The quoted phrase must be taken in the context
that a final decision may not be based upon anything *dehors* the
record. Petitioner does not point to any determination or
finding that was based on evidence not contained in the record.
The issue in *Matter of Opinion No. 583* was *ex parte* consulta-
tions between the prosecuting Deputy Attorney General as an
attorney before an Administrative Law Judge consulting *ex
parte* with the administrative agency. Further, *Matter of
Opinion No. 583* is not inconsistent with, and does not over-
rule, the proposition that the administrative agency need not
review the entire transcript of the record before the ALJ.

Pursuant to *R.* 2:10-5, we have reviewed the transcripts and
the full record in this matter and conclude that the Commission-
er's decision was amply supported by substantial credible evi-
dence and that his actions were not arbitrary, capricious or

unreasonable. *Henry v. Rahway State Prison,* 81 *N.J.* 571, 579–580 (1980).

## IV

 Lastly, petitioner contends that "[n]one of the actions upon which reliance is placed below, neither the September 1, 1978 issuance of Athletic Guidelines by OEEO, nor the April 15, 1985 resolution of the NJSIAA [Athletic Association] Executive Committee, nor the March 26, 1986 issuance of Athletic Guidelines by OEEO nor any action by the Commissioner of Education were taken in conformance with the Administrative Procedure Act. [*N.J.S.A.* 52:14B–4 *et seq.*]" He concludes that "[t]herefore, based upon the direct state action involved in NJSIAA [Athletic Association] action itself, and based upon the entanglement of the State Board of Education and Commissioner of Education, through *NJSA* 18A:11–3, 4 and 5, the Administrative Procedures Act applies."

The activities of the Athletic Association in sponsoring, administering, regulating and supervising interscholastic athletics constitute state action. *Christian Bros. Inst. v. N.J. Interschol. League,* 86 *N.J.* 409, 416–17 (1981); *Clark v. Arizona Interschol. Ass'n,* 695 *F.*2d at 1128. Nevertheless, the fact that the activities of the Athletic Association constitute state action does not in itself classify an organization or association as a state agency.

There can be no doubt that the OEEO is a component part of the Department of Education and as such, any rules and regulations promulgated by it must be in accordance with the Administrative Procedure Act. Policy guidelines, regardless of the label, which "constitute an agency statement of general applicablility which implicates policy designed to assist all local school districts" must comply with the Administrative Procedure Act pertaining to rulemaking by a state agency. *Board of Educ. of City of Plainfield v. Cooperman,* 209 *N.J.Super.* 174, 206, 207 (App.Div.1986), mod. and aff'd 105 *N.J.* 587 (1987). On

the other hand the fact that the athletic guidelines are referred to as "guidelines" does not establish that they are policy matters requiring publication pursuant to the Administrative Procedure Act. The athletic guidelines are in the form of questions and answers to illustrate suggestive solutions to hypothetical factual situations which might arise in the future.[7]

The athletic guidelines were prepared merely to assist local school districts and the Athletic Association in applying *N.J. A.C.* 6:4–1.5(f) which provides:

(f) The athletic program, including but not limited to intramural, extramural, and inter-scholastic sports, shall be available on an equal basis to all students regardless of race, color, creed, religion, sex, ancestry, national origin or social or economic status. The athletic program as a whole shall be planned to insure

---

[7]The following are some relevant examples:

Question 8: If a school sponsors a team in a particular sport for one sex but no similar team is provided for members of the opposite sex, must the excluded sex, (that sex not provided the team in a particular sport) be allowed to try out for that team?

Answer: If overall athletic opportunities are limited for either sex (in many cases, this will apply to females), then the sex having limited opportunities *must* be allowed to try out for that team.

If overall athletic opportunities are not limited for one sex, (very often males), the school is not required to permit the excluded sex to try out. For example, if a school provides gymnastics for girls and no such team for boys, the school is not required to permit boys to try out if their overall athletic opportunities are not limited.

If it can be shown that neither sex has limited opportunities, the school may establish its own policy as to whether students of one sex may try out for teams established for members of the opposite sex.

\* \* \* \* \* \* \* \*

Question 12: A school has sponsored separate teams for males and females in golf, tennis, track and field, and swimming and diving. For one reason or another, the school ends the dual program and initiates single programs in these sports. All but a few females are eliminated from these sports. Assuming that the rest of the male and female sports programs are equal, has the school violated any provisions of Title 6?

Answer: Yes, it would seem that opportunities for female participation is being seriously curtailed violating Title 6 regulations. If the "one reason or another" is budgetary, rather than eliminating separate teams in four activities, it would be more equitable to completely eliminate two activities and maintain separate teams in the two remaining activities.

that there are sufficient activities so that the program does not deny the participation of large numbers of students of either sex.

\* \* \* \* \* \* \* \*

2. A school may choose to operate separate teams for the two sexes in one or more sports and/or single teams open competitively to members of both sexes, so long as the athletic program as a whole provides equal opportunities for students of both sexes to participate in sports at comparable levels of difficulty and competency.

It is not realistically possible that *N.J.S.A.* 18A:36-20 and code regulation could envision each type of situation which may arise in overseeing athletic events in all the local school districts throughout the state. The guidelines are based upon factual situations which may arise, not only under *N.J.A.C.* 6:4-1.5(f), but also in the administration by the Athletic Association of its policies as stated in its regulation of August 15, 1985 concerning the promotion of equal athletic opportunities for females. The guidelines may be classified as an informal action concerned with the supervising and advising the district boards of education rather than the promulgation of rulemaking. See *In re Solid Waste Util. Cust. Lists*, 106 *N.J.* 508, 518-519 (1987).

The Athletic Association is an independent voluntary association of the boards of education of local school districts as well as private schools who have elected to join the association for the coordination and regulation of athletic programs in conjunction with other school districts. The rules and regulations are promulgated by the Athletic Association and the school district. The local school district becomes subject to its constitution, bylaws, rules and regulations by joining a voluntary association. It is a confederation by which local school boards agree to become bound by the rules and regulations of the voluntary association for the orderly regulation of their athletic programs. Since the Athletic Association is a private organization, its rules and regulations are not the subject to the Administrative Procedure Act concerning rulemaking.

The approval of the Athletic Association's regulations by the Commissioner as required by *N.J.S.A.* 18A:11-3 is not an adoption of those rules and regulations so as to require them to be

promulgated under the Administrative Procedure Act. The purpose of requiring approval by the Commissioner of the rules and regulations of the Athletic Association and requiring an annual report is to insure that "the legislative intent in granting authority to boards of education to join such associations is faithfully being executed." *Statement of Governor Byrne* on Senate Bill 789 2d OCR (*N.J.S.A.* 18A:11-3), remanding the initial bill for suggested changes. The purpose of *N.J.S.A.* 18A:11-3 as stated by the Assembly Education Committee in its statement to Assembly No. 1349 states that the purpose of the bill is "to grant to the Department of Education the authority to *oversee* the policies and regulations of these associations" (emphasis supplied) and "generally to monitor the implementation of this bill."

We are satisfied that the athletic guidelines are not rules required to be promulgated within the rulemaking process under the Administrative Procedure Act. Nor does the approval by the Commissioner of the rules and regulations of the Athletic Association constitute a promulgation of rules and regulations by the Commissioner.

Affirmed.