962 A.2d 577 (2009)
404 N.J. Super. 491
DEBORAH HEART AND LUNG CENTER, Appellant,
v.
Heather HOWARD, J.D., Commissioner of the New Jersey Department of Health and Senior Services, Respondent.
No. A-4131-07T3
Superior Court of New Jersey, Appellate Division.
Argued November 6, 2008.
Decided January 14, 2009.
*580 R. James Kravitz, Lawrenceville, argued the cause for appellant (Fox Rothschild, L.L.P., attorneys; Jonathan D. Weiner, of counsel; Mr. Weiner, Maureen E. Kerns, and Abbey True Harris, on the brief).
Susan J. Dougherty, Deputy Attorney General, argued the cause for respondent (Anne Milgram, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Ms. Dougherty, on the brief).
Before Judges PARRILLO, LIHOTZ and MESSANO.
The opinion of the court was delivered by
PARRILLO, J.A.D.
At issue is a regulatory agency's classification of a certain medical procedure, transmyocardial revascularization (TMR), when performed by its licensees in conjunction with coronary artery bypass graft (CABG) surgery. On March 6, 2008, the Commissioner of the Department of Health and Senior Services (DHSS) announced a change in the manner of reporting to the public risk-adjusted mortality data on open heart surgery, having determined to treat cases involving CABG plus TMR as stand-alone or "Isolated CABG" in its cardiac report cards dating from 2005 forward. Maintaining that this inclusion would inflate its mortality statistics, Deborah Heart and Lung Center (Deborah), a licensed cardiac surgery center, challenges the unilateral agency decision, made without benefit of formal rulemaking, as violative of both the Health Care Facilities Planning Act (HCFPA), N.J.S.A. 26:2H-1 to -26, and the Administrative Procedure Act (APA), N.J.S.A. 52:14B-1 to -15, and consequently, of its right to administrative due process. For the following reasons, we disagree.
The essential facts are not in dispute. Deborah is a not  for-profit tertiary care hospital. Located in Browns Mills, Deborah *581 serves a disproportionately high number of uninsured and charity care patients and, therefore, must rely on its volume of services and the revenues generated by them to carry out its charity. Deborah, one of eighteen licensed cardiac surgery centers in New Jersey, specializes in state-of-the-art cardiac services, including CABG surgeries, performed both as stand-alone procedures and in conjunction with other surgical interventions. The CABG surgical procedure treats narrowing or stenosis of the coronary arteries. A cardiothoracic surgeon performs the procedure by creating bypasses around the obstructions in the coronary arteries with arteries or veins from elsewhere in the body to improve blood flow to the heart (that is, revascularization of the myocardium).
Depending on the patient's underlying condition, CABG surgery may be accompanied by any one or more of a number of other cardiac or non-cardiac procedures. Certain of these other procedures, when performed with a CABG surgery, may be associated with a significant risk to the patient, while others are considered low-risk. One such "other procedure" is TMR, which involves creation of multiple channels in the left ventricular myocardium with a laser fiber.
Since 1977, as part of its cardiac licensing regulations, N.J.A.C. 8:33E-2.10, the DHSS has published an annual report on CABG surgery at the State's eighteen cardiac surgery centers.[1] These publications, known as cardiac report cards, are intended to provide hospitals and surgeons with data in assessing the quality of cardiac procedures, and physicians and their patients with information in deciding where to have these procedures performed. The report cards, in turn, are based on statistical data on the results of CABG surgeries, which the cardiac surgery centers, by regulation, have been providing the DHSS since 1994. From the collected data, the DHSS forms a database used to calculate hospital, surgeon, and statewide Observed/Expected (O/E) mortality rates, which, in turn, form the basis for the published report cards.
To report this information, the facilities use open heart surgery data collection forms, which require disclosure of cardiac surgeries performed in conjunction with one or more other procedures. Cases in which the "other procedure," when performed with a CABG surgery, is associated with a significant risk to the patient, are excluded from the DHSS' report card's data analysis. Correspondingly, if the "other procedure" is determined to be low risk when performed with the CABG surgery, the patient is considered to have had CABG only, or "Isolated CABG" surgery, and therefore this data would be included in the agency's analysis. The forms have gone through several modifications over the years as a result of developments in technologies or best practices adopted by the Society of Thoracic Surgeons. The current version of the form is dated January 1, 2005.
To assist cardiac surgery centers in completing the data forms, the DHSS publishes an open heart surgery (OHS) data collection system instruction manual. The manual's instructions and data specifications are aligned with the guidelines of the Society of Thoracic Surgeons. The guidelines require cardiac surgery centers to provide complete data for each patient undergoing cardiac surgery. These facilities are also permitted to submit mortality *582 cases to be considered for exclusion from data reporting where there are extenuating circumstances such as resuscitation of the patient en-route to the operation room; an angioplasty or cardiac catheterization crash; or a patient's refusal of blood products. Since its first publication in 1998, the instruction manual has been modified three times: on January 1, 2000, January 1, 2005, and January 1, 2007.
All three previously published manuals instructed that where a TMR procedure was performed during a CABG surgery, the cardiac surgery centers were to report the surgery as "CABG + Other," and, therefore would not be included in the DHSS' data analysis. Despite these instructions, however, there has been an inconsistency over the years in the manner in which the cardiac surgery centers were reporting CABG surgery with TMR. Some were reporting CABG surgeries that included TMR as "CABG + Other" surgeries, while others reported these surgeries simply as "Isolated CABG" surgeries.
DHSS staff first noticed the inconsistent reporting while preparing to issue its first cardiac report card following the 2005 revision of the data collection form. Because the inconsistency in reportage impacted the integrity of the its cardiac surgery mortality data, the DHSS consulted with its Clinical Review Panel,[2] who unanimously recommended that TMR be considered a "low risk" procedure and that CABG surgery plus low risk additional procedures be designated as "Isolated CABG" and be kept in the analysis, while CABG surgeries with high risk additional procedures be designated as "CABG + Other," and be excluded from the analysis. The Panel also recommended that, upon request, a mortality case involving an additional procedure may be reviewed for exclusion from the cardiac report card as a salvage case.
Following the Panel's recommendation, on October 22, 2007, the Commissioner announced that all automatic implantable cardioverter defibrillator (AICD), TMR, and Pacemaker cases previously reported as "CABG + Other" would be recoded as "Isolated CABGs" as long as there was no other procedure performed on that case. Deborah, one of nine of the eighteen cardiac surgery centers performing TMR and the only one offering TMR as part of a comprehensive revascularization option for critical patients, objected by letter of October 24, 2007, contending the sudden change in policy was misleading and confusing to the public and improper. Consequently, Deborah refused to "approve the final frequencies as provided to the [DHSS] for the 2005 Isolated CABG Report Card."
The DHSS responded on November 14, 2007, requesting that Deborah reconsider its decision, and noting that the new approach "was applied to all [New Jersey cardiac surgery] facilities and 16 of 18 have verified and signed-off on their data for analysis." It appears Deborah persisted in its refusal even after being notified that DHSS would label the facility non-cooperative, but also requested deferral of the threatened action pending a meeting with the Commissioner and staff.
That meeting was held on December 12, 2007 and attended by the members of the Cardiac Hospital Advisory Panel (CHAP)[3] *583 and representatives from fourteen of the eighteen cardiac surgery centers, including Deborah. Specifically, CHAP was asked to review the Clinical Review Panel's recommendation to reclassify "CABG + TMR" cases as "Isolated CABG," and was provided the following background:
Of the 18 cardiac surgery facilities in New Jersey, nine perform transmyocardial revascularization (TMR). Over the years of the report card, some hospitals have submitted cases with coronary bypass plus TMR as Isolated CABG cases while others have submitted them as "CABG plus Other" procedures. The latter category has historically been excluded from the report card. Because of the disparity in reporting, the Clinical Review Panel was asked to consider various additional procedures that can be performed with CABG surgery. The panel reviewed each of the additional procedures and made recommendations regarding procedures which added little or no risk and those which added significant risk. The panel recommended that CABG surgery plus low risk procedures would be designated as Isolated CABG and be kept in the report. CABG surgeries with high risk additional procedures would be designated as "CABG plus Other" and would be excluded from the report. No outcome data from New Jersey hospitals were reviewed to make the decision. The decision was a reflection of the clinical judgment and existing literature reviewed by the panel. Based on the panel's clinical judgment, CABG plus TMR was considered an Isolated CABG. The panel also recommended that any surgeon or hospital could submit a mortality case that involved an additional procedure to be reviewed for exclusion from the cardiac surgery report.
At the conclusion of the meeting and following the protests of Deborah and one other cardiac surgery center, the CHAP endorsed the Clinical Review Panel's recommendation that "CABG + TMR" be considered an "Isolated CABG". However, because the "TMR + CABG" procedure is performed on high-risk patients, the CHAP also suggested that the DHSS consider using TMR as a risk factor in the risk-adjustment analysis.
Thereafter, on March 6, 2008, the DHSS formally announced that it would "implement the recommendation on `CABG plus TMR' as Isolated CABG surgery[,]" retroactive to 2005. In writing to the cardiac surgery centers' OHS data managers, the DHSS explained that, "while preparing to issue the first cardiac surgery report following the recent revision of the data collection form, Department staff sought advice [from its Clinical Review Panel] on the designation of Isolated CABG surgery[,]" to "reinforce consistency in data reporting." The DHSS further articulated its reasoning in subsequent correspondence to the OHS managers, wherein the agency also clarified the way in which the affected facilities were to report their cardiac assessment data.
Deborah then requested the DHSS stay "publication of 2005, 2006, and 2007 [CABG] statistics" to remain in effect until the agency engages in formal rulemaking where the objector could exercise its due process right to be heard. In the absence of a timely response, Deborah brought this *584 appeal, arguing the agency's unilateral decision was arbitrary, violative of procedural due process, and non-compliant with both the HCFPA and the APA. Arguing it would otherwise suffer irreparable harm, Deborah moved for a stay and to accelerate the appeal, which relief we granted.
Deborah contends that the DHSS' reclassification of the TMR procedure represents a significant change from previous agency position, constituting de facto administrative rulemaking necessitating compliance with statutory rulemaking procedures. We disagree. The DHSS' modification of its reporting methodology amounted to no more than informal agency action, which, although not subject to the APA's requirements governing adoption of agency rules, was nevertheless preceded by adequate notice to the regulated class and an opportunity to be heard.
We emphasize at the outset that no one disputes the DHSS' inherent authority to collect and disseminate cardiac quality assessment data. Indeed, Deborah does not contest that the Commissioner's adoption of a reporting methodology was within her statutory power. On this score, the HCFPA entrusts the DHSS with the "central responsibility for the development and administration of the State's policy with respect to health planning, hospital and related health care services." N.J.S.A. 26:2H-1. As part of her responsibility to supervise a regulated industry, the Commissioner is vested with, among other authorities, the power to "inquire into health care services and the operation of health care facilities." N.J.S.A. 26:2H-5(a). To this end, the Commissioner may adopt rules and regulations governing "the establishment of requirements for a uniform Statewide system of reports and audits relating to the quality of health care provided." N.J.S.A. 26:2H-5(b). Accordingly, in the absence of any further direction in its enabling Act as to how to manage this information, the DHSS promulgated regulations governing cardiac quality assessment data. These regulations mandate that the State's cardiac surgery centers "maintain and provide data on patient characteristics and outcomes, ... as determined by the Department," using "a standardized format determined by the Department." N.J.A.C. 8:33E-2.10(a) (emphasis added). The patient care and outcome data includes "mortality and morbidity information and other information relative to the specific cardiac surgery center, as determined by the Department." Ibid. (emphasis added).
This much is clear. At issue here is whether the decision as to the exact methodology for classifying such data may be made by the DHSS without prior promulgation of a rule or regulation, thus triggering the procedural steps required to validate the ultimate agency action. In this regard, the enabling legislation left the determination of how best to disseminate cardiac quality assessment data to the discretion of the DHSS. N.J.S.A. 26:2H-1; N.J.S.A. 26:1A-37.
It is by now well settled that, in carrying out their legislatively-delegated duties, administrative agencies have wide discretion in selecting the means by which they must fulfill their missions. Texter v. Dept. of Human Servs., 88 N.J. 376, 383-84, 443 A.2d 178 (1982) (citations omitted). Agencies "possess the ability to be flexible and responsive to changing conditions." Id. at 385, 443 A.2d 178. "This flexibility includes the ability to select those procedures most appropriate to enable the agency to implement legislative policy." Ibid. In other words, the procedural choice itself is highly discretionary. Metromedia, Inc. v. Dir., Div. of Taxation, 97 N.J. 313, 331, 478 A.2d 742 (1984).
*585 In the exercise of their delegated statutory authority, administrative agencies may act "informally, or formally through rulemaking or adjudication in administrative hearings." Texter, supra, 88 N.J. at 383-84, 443 A.2d 178 (citations omitted). Informal agency action is "any determination that is taken without a trial-type hearing, including investigating, publicizing, negotiating, settling, advising, planning, and supervising a regulated industry." Northwest Covenant Med. Ctr. v. Fishman, 167 N.J. 123, 136-37, 770 A.2d 233 (2001). Such action "constitutes the bulk of the activity of most administrative agencies." In re Request for Solid Waste Util. Customer Lists, 106 N.J. 508, 518, 524 A.2d 386 (1987).
Of course, agencies may act more formally through rulemaking. An administrative rule has been defined as:
... each agency statement of general applicability and continuing effect that implements or interprets law or policy, or describes the organization, procedure or practice requirements of any agency. The term includes the amendment or repeal of any rule, but does not include: (1) statements concerning the internal management or discipline of any agency; (2) intraagency and interagency statements; and (3) agency decisions and findings in contested cases.
[N.J.S.A. 52:14B-2(e).]
Although, as noted, agencies "have wide latitude in improvising appropriate procedures to effectuate their regulatory jurisdiction[,]" Metromedia, Inc., supra, 97 N.J. at 333, 478 A.2d 742, this discretion is not unbounded. Id. at 334, 478 A.2d 742. Rather, standards have been developed to control the procedural choice of proceedings. Ibid. More specifically, in determining whether agency action constitutes rulemaking, courts inquire whether the agency action:
(1) is intended to have wide coverage encompassing a large segment of the regulated or general public, rather than an individual or a narrow select group; (2) is intended to be applied generally and uniformly to all similarly situated persons; (3) is designed to operate only in future cases, that is, prospectively; (4) prescribes a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization; (5) reflects an administrative policy that (i) was not previously expressed in any official and explicit agency determination, adjudication or rule, or (ii) constitutes a material and significant change from a clear, past agency position on the identical subject matter; and (6) reflects a decision on administrative regulatory policy in the nature of the interpretation of law or general policy.
[Coalition for Quality Health Care v. N.J. Dep't of Banking & Ins., 348 N.J.Super. 272, 296, 791 A.2d 1085 (App. Div.) (quoting Metromedia, Inc., supra, 97 N.J. at 331-32, 478 A.2d 742), certif. denied, 174 N.J. 194, 803 A.2d 1165 (2002).]
Not all of these factors must be present for an agency action to constitute rulemaking. Ibid. Rather the factors are balanced according to weight. Ibid. The hallmark of an administrative rule is its expression of a general standard of administrative policy with widespread coverage and continuing effect. Metromedia, Inc., supra, 97 N.J. at 331, 478 A.2d 742.
When rulemaking is involved, the agency must follow statutory procedures for the adoption of administrative rules to validate its ultimate action. Ibid. "These procedures call for public notice of the anticipated action, broad participation of interested persons, presentation *586 of the views of the public, the receipt of general relevant information, the admission of evidence without regard to conventional rules of evidential admissibility, and the opportunity for continuing comment on the proposed agency action before a final determination." Ibid.; see also N.J.S.A. 52:14B-4.
To be sure, "the line between agency rulemaking, on the one hand, and informal action, on the other can become blurred[,]" Northwest Covenant Med. Ctr. v. Fishman, 167 N.J. 123, 137, 770 A.2d 233 (2001), although in some cases it is rather clear that only informal agency action is involved. For example, in In re Request for Solid Waste Util. Customer Lists, supra, the Court held that the Board of Public Utilities' order requiring solid waste utilities to provide the Board with complete lists of all their customers was not rulemaking subject to the APA. 106 N.J. at 517-18, 524 A.2d 386. The Court reasoned that the mere act of collecting information amounted to no more than informal agency action, which was inferable from its enabling statute and did not change Board policy concerning the solid waste industry. Ibid. Similarly, in B.C. ex rel. C.C. v. Bd. of Educ., 220 N.J.Super. 214, 531 A.2d 1059 (App.Div.1987), we held that athletic guidelines published by the Department of Education to assist local school districts and the New Jersey State Interscholastic Athletic Association in applying a regulation assuring equalization of athletic opportunities for females were not rules that had to be promulgated within the APA's rulemaking process. Id. at 234-35, 531 A.2d 1059. Rather, the guidelines may be classified as informal supervisory and advisory action by the Commissioner acting in an oversight capacity. Ibid. In so holding, we noted:
It is not realistically possible that N.J.S.A. 18A:36-20 and code regulation could envision each type of situation which may arise in overseeing athletic events in all the local school districts throughout the state. The guidelines are based upon factual situations which may arise, not only under N.J.A.C. 6:4-1.5(f), but also in the administration by the Athletic Association of its policies as stated in its regulation of August 15, 1985 concerning the promotion of equal athletic opportunities for females. The guidelines may be classified as an informal action concerned with the supervising and advising the district boards of education rather than the promulgation of rulemaking.

[Id. at 234, 531 A.2d 1059 (emphasis added).]
Viewed against this background and applying the Metromedia standards, we are satisfied that in reclassifying the collected data, the DHSS did not engage in de facto rulemaking and thus did not need to conform to APA requirements. In the first place, the agency's coding change will not have "wide coverage encompassing a large segment of the regulated or general public" as it impacts only a "narrow, select group." Instead, the revision affects only nine of the eighteen cardiac surgery centers in New Jersey that perform TMR, and, even there, TMR is not widely practiced as it is a newer, more complicated procedure. Moreover, very few licensees are similarly situated inasmuch as only Deborah offers the option of TMR as part of a comprehensive revascularization option for critical patients.
Second, the agency action here prescribes a directive that is expressly within its delegated statutory authority. In fact, Deborah points to no statutory or regulatory prohibition on treating cases involving "CABG plus TMR" as comparable to stand-alone CABG surgical procedures for purposes of reporting mortality data to the public. On the contrary, the enabling legislation *587 plainly left that determination, reliant as it is on special agency expertise, to the broad discretion of the DHSS. Indeed, considering the extent of expert consultation involved, the broad factfinding typical of rulemaking was not warranted to buttress the soundness of the administrative determination at issue here.
Third, and most significant, the revision neither modified long-established administrative practice nor effected a material change thereof. As to the former, even though the manual instructed how the regulated class was to report cardiac surgery data to the DHSS, it did not address the manner in which the regulator may choose to report the risk-adjusted mortality rates to the public. Moreover, to the extent the forms, manuals and report cards expressed administrative policy, they were in a state of continuous modification, neither definitively settled nor officially endorsed. For instance, as early as 2000, the DHSS was refining the manner in which it was reporting CABG surgery data in its cardiac report cards. And in its 2003 report card, the DHSS modified its definition of "mortality." Similarly, since 1998, the agency has thrice modified its instructions for data reporting. Significantly, all these changes were effected informally, through correspondence with the regulated entities, and none was the subject of formal rulemaking.
Nor was the instant modification material. This latest adjustment was made to eliminate inconsistency in the licensees' reportage of mortality data and thus to clarify the apparent confusion. Indeed, some licensees were already reporting "CABG + TMR" in the "Isolated CABG" category. Even the DHSS at times considered a CABG surgery performed with TMR as "Isolated" or stand alone CABG surgery. In his March 19, 2002 letter to OHS data managers, the Director of the DHSS' Office of Research and Development advised that the agency did not consider "CABG + TMR" to be one of the combinations warranting exclusion from the "Isolated CABG" category. Thus, to the extent that the agency's most recent pronouncement simply clarified existing administrative practice, it represents no change at all, much less a material one. On the other hand, to the extent the latest directive deviated from the manual's data reporting guidelines, the shift is hardly significant. As noted, the guidelines, which simply instruct how cardiac surgery centers are to complete the data collection forms, were themselves never the subject of rulemaking and never addressed the very issue at hand here, namely, the manner in which the DHSS reports its collected data to the public.
Finally, we find no prejudice to Deborah from the administrative action. The fact that an entity may be impacted by an agency decision does not, in and of itself, give rise to a right to notice and participation in the administrative process. Elizabeth Fed. Sav. & Loan Ass'n v. Howell, 24 N.J. 488, 505, 132 A.2d 779 (1957). Moreover, while positing that the "new reporting methodology will simply make Deborah's program appear far less safe than it is in reality," appellant has presented no supporting evidence. Nor has it demonstrated that the inclusion of "CABG plus TMR" cases in the cardiac report card will result in false or erroneous data, or how its statistics in this regard will compare to those of other cardiac surgery centers.
The fact remains that the agency directive does not single out any one cardiac surgery center, but applies generally and uniformly to all affected parties alike. And, in this regard, there is no additional burden or requirement imposed on Deborah beyond those that already exist. See, e.g., N.J.A.C. 8:33E-2.10. Furthermore, *588 any so-called skewed or misleading reporting will be cured by the DHSS' risk-adjustment calculations, accounting for TMR among other things, and its explanation of this methodology in the cardiac report cards issued to the public. For instance, the report card instructs that "[t]he risk-adjusted mortality rate gives `extra credit' to hospitals and surgeons with sicker patient populations, in order not to disadvantage them in the performance comparisons." Consequently, these risk-adjustment mortality rates provide a fairer basis of comparison.
In the absence of any prejudice to the affected class, we perceive no barrier to the retroactive application of the agency reclassification decision, to encompass its 2005 to 2007 cardiac report cards. Gibbons v. Gibbons, 86 N.J. 515, 522, 432 A.2d 80 (1981). While Deborah claims to have relied on the manual's instructions in reporting the requisite data to the DHSS, we do not find the consequences of such reliance to be "so deleterious and irrevocable that it would be unfair to apply the [directive] retroactively." Id. at 524, 432 A.2d 80. After all, Deborah remains obligated to submit the required information to the DHSS no matter the particular format chosen by the agency or the exact methodology by which the data is ultimately analyzed.
For all these reasons, therefore, we find the rulemaking provisions of N.J.S.A. 52:14B-4 inapplicable here. We are also satisfied, however, that even though not required, the agency's informal administrative action was preceded by adequate notice to the affected regulated class and an opportunity to be heard, which Deborah fully exercised. Deborah communicated its concerns to the DHSS and attended the December 12 meeting wherein it voiced its objection, along with one other cardiac surgery center. In response, the DHSS, after consultation with and explanation from its expert panels, fully articulated the basis for its determination. No more by way of administrative due process was required.
Lastly, we find the agency's reclassification decision neither arbitrary, capricious nor unreasonable. We do not "substitute our judgment as to the wisdom of fair and reasonable administrative action[.]" In re Critchlow, 201 N.J.Super. 371, 375, 493 A.2d 66 (App.Div.1985) (quoting Campbell v. Dept. of Civil Serv., 39 N.J. 556, 562, 189 A.2d 712 (1963)). "[I]n a complex area where the Legislature has delegated a great amount of discretion to the administrative experts, deference must be accorded to the administrative agency's expertise and experience in its domain." In re Certificate of Need Granted to the Harborage, 300 N.J.Super. 363, 379, 693 A.2d 133 (App.Div.1997) (citations omitted). Here, prior to its determination, the DHSS consulted with its expert advisory panels, whose recommendations, in turn, "were based on clinical judgment as well as literature reviewed by the Panel[s]." The DHSS also held a meeting with industry representatives to discuss these recommendations. Deborah simply has not demonstrated that the resultant agency decision was unreasonable.
Affirmed.
NOTES
[1] "Cardiac surgery center" refers to a facility capable of providing invasive diagnostic catheterization, and all treatment modalities including open and closed heart surgical procedures. N.J.A.C. 8:33E-1.2.
[2] The Clinical Review Panel was formed in 1997, and its existence was formalized in 2007 by the Commissioner's Executive Directive No. 207. It is composed of three cardiac surgeons and two cardiologists.
[3] CHAP was established "to provide the Commissioner with expert clinical and/or technical advice required for the development of sound cardiovascular health policy[]"; to "provide advice on implications of changes in technology and/or patterns of practice for State standards and criteria for cardiac services"; and to "advise on the development and implementation of Statewide cardiac research and data activities." N.J.A.C. 8:33E-1.14. CHAP is composed of eighteen members, including surgeons and cardiologists, four of whom are also members of the Commissioner's Clinical Review Panel.